**BROWN & CONNERY, LLP**
William M. Tambussi, Esq. (ID No. 031431983)
Jonathan L. Triantos, Esq. (ID No. 210172016)
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108
(856) 854-8900
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MALL CHEVROLET, INC., <br><br> Plaintiff, <br><br> v. <br><br> GENERAL MOTORS LLC, <br><br> Defendant. | Civil Action No.: 1:18-cv-15077 |

**MEMORANDUM OF LAW IN SUPPORT OF MALL'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE UNLAWFUL CHARGEBACKS ASSERTED AGAINST MALL (COUNT V)**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION.................................................................................................... 1

PROCEDURAL HISTORY...................................................................................... 3

SUMMARY JUDGMENT STANDARD................................................................. 4

LEGAL ARGUMENT.............................................................................................. 5

I.     THE NEW JERSEY FRANCHISE PRACTICES ACT PROVIDES AMONG THE STRONGEST STATUTORY PROTECTIONS TO MOTOR VEHICLE FRANCHISEES IN THE COUNTRY.......................................... 5

     A.    Legislative Intent........................................................................... 5

     B.    Provisions Relating to Chargebacks Against Motor Vehicle Franchisees.................................................................................... 7

II.    MALL IS A NEW JERSEY MOTOR VEHICLE FRANCHISE................ 8

III.   GM ASSERTED $656,033.04 IN UNLAWFUL CHARGEBACKS AGAINST MALL................................................................................... 9

     A.    Chargebacks for Handwritten Information on Job Cards............... 10

     B.    Chargebacks for Improper Service Management Authorizations............................................................................... 14

     C.    Chargebacks for No Delivery Date on Job Cards.......................... 21

     D.    Chargebacks Involving Citations to Provisions in Inapplicable Editions of GM's SP&Ps Manual and/or Non-Existent Provisions of GM's SP&Ps Manual............................................. 24

          1.   Citations to Section 1.6.2.2.................................................. 24

          2.   Citations to Section 3.1........................................................ 25

          3.   Citations to Section 3.2.9..................................................... 26

ii

    4. Citations to Section 1.4.................................................................... 26

    5. Citations to Section 3.2.12.............................................................. 28

E. Falsification Chargebacks................................................................ 32

CONCLUSION........................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**CASES**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)................................................................................................................ 4

Bus. Store, Inc. v. Mail Boxes Etc.,
2012 WL 525966 (D.N.J. Feb. 16, 2012)............................................................................ 6

Gen. Motors Corp. v. Gallo GMC Truck Sales, Inc.,
711 F. Supp. 810 (D.N.J. 1989).......................................................................................... 5, 7

Hagen Constr., Inc. v. Whiting-Turner Contracting Co.,
2018 WL 1918470 (D.N.J. Apr. 24, 2018).......................................................................... 5

Kubis & Perszyk Associates, Inc. v. Sun Microsystems, Inc.,
146 N.J. 176 (1996)............................................................................................................... 5

Liberty Lincoln-Mercury v. Ford Motor Co.,
134 F.3d 557 (3d Cir. 1998)................................................................................................. 6

Matsushita Electric Indus. Co., Ltd. v. Zenith Radio,
475 U.S. 574 (1986)............................................................................................................... 4

Red Roof Franchising, LLC v. Patel,
877 F. Supp. 2d 124 (D.N.J. 2012).................................................................................... 5, 6

Tynan v. Gen. Motors Corp.,
127 N.J. 269 (1992)............................................................................................................. 5, 6

Tynan v. Gen. Motors Corp.,
248 N.J. Super. 654 (App. Div. 1991)............................................................................... 5, 6

Williams v. Borough of West Chester,
891 F.2d 458 (3d Cir. 1989)................................................................................................. 4

**RULES AND STATUTES**

Fed. R. Civ. P. 56.................................................................................................................... 4

N.J.S.A. 56:10-1 *et seq.*...................................................... 1, 2, 5, 6, 7, 8, 10, 14, 21, 24, 32, 35

**OTHER SOURCES AND AUTHORITIES**

Eric L. Chase, <u>Special Industry Laws for Car Dealers,</u>
N.J. Law., February 2016 (2016)..........................................................................................7

<u>N.J. Legislative Statement,</u>
L.1977, Assembly No. 1956 (May 24, 1976)...................................................................6

<u>N.J. Legislative Statement,</u>
L.2011, Assembly No. 3722 (January 20, 2011)............................................................6

## **INTRODUCTION**

This Motion for Partial Summary Judgment is brought because Plaintiff, Mall Chevrolet, Inc. ("Mall"), is entitled to judgment, as a matter of law, on its claim relating to the unlawful chargebacks asserted by Defendant, General Motors ("GM") against Mall in violation of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 *et seq.*, ("NJFPA"), as alleged in Count V of Mall's Complaint.

Mall has been an authorized GM dealer for over thirty years. During that time, Mall has been one of GM's top selling dealers in New Jersey and the country, consistently received "Superior" dealer ratings and "Elite Leader" status from GM, been recognized by GM as "among the best-of-the-best," and received numerous awards for its sales and outstanding service to individuals, businesses, and government entities alike.

On May 30, 2018, following a 10-month audit of Mall, GM sent a Notice of Breach letter to Mall and enclosed an Audit Summary Report and Deviation Detail Report reflecting 517 alleged deviations asserted against Mall totaling $672,176.59 in chargebacks. On May 31, 2018, Mall responded to GM's Audit Summary Report and Deviation Detail Report, addressing each claimed deviation and the reasons why each claimed deviation should be overturned and the chargebacks should not be asserted against Mall. On July 31, 2018, GM sent a Notice of Termination letter to Mall and enclosed a revised Audit Summary Report and Audit Review Results reflecting 12 deviations overturned by GM and a reduction of the total chargebacks to $656,033.04.

GM's audit of Mall, alleged deviations of GM's Service Polices & Procedures ("SP&Ps") Manual by Mall, and purported chargebacks asserted against Mall are severely flawed and do not

1

meet the strict criteria for lawful chargebacks against motor vehicle franchisees as set forth in N.J.S.A. 56:10-15(f). *First*, while GM asserted 517 alleged deviations against Mall, 104 of those alleged deviations are duplicates. Consequently, 413 alleged deviations were actually asserted against Mall. Almost all of the alleged deviations asserted violations of multiple provisions of GM's SP&Ps Manual.

*Second*, 314 of the 413 alleged deviations asserted against Mall involve Mall's utilization of handwritten information on job cards, despite (a) GM's SP&Ps Manual expressly permitting handwritten entries on job cards, (b) GM's auditors admitting that handwritten entries on job cards was not prohibited by GM's SP&Ps Manual, and (c) GM's third-party training program advising that handwritten entries on job cards was permitted under GM's SP&Ps Manual.

*Third*, 344 of the 413 alleged deviations asserted against Mall involve "improper service management authorizations" by Mall's service dispatchers, despite (a) GM's SP&Ps Manual permitting supervisory employees, such as Mall's dispatchers, to provide service management authorizations, (b) GM's management internally acknowledging ambiguities in GM's SP&Ps Manual and questioning whether Mall's dispatchers should be permitted to provide service management authorizations throughout the audit, (c) Mall's regional personnel admitting that they previously permitted Mall's dispatchers to provide service management authorizations, (d) GM's auditors admitting that GM's SP&Ps Manual does not prohibit Mall's dispatchers from providing service management authorizations, and (e) GM's utilization of an inapplicable 2013 SP&Ps Manual to justify its purported chargebacks against Mall.

*Fourth*, 226 of the 413 alleged deviations asserted against Mall involve "no delivery date" on Mall's job cards, despite (a) the delivery dates being attached to each job card generated

2

by Mall, and (b) GM's auditors admitting that the delivery dates were attached to each job card generated by Mall, but overlooked by the auditors.  *Fifth*, at least 101 of the 413 alleged deviations asserted against Mall involve GM's citation to provisions in inapplicable editions of GM's SP&Ps Manual and/or provisions that are nowhere to be found in any recent edition of GM's SP&Ps Manual. GM's auditors admitted to these crucial errors during the audit of Mall. *Sixth*, 53 of the 413 alleged deviations asserted against Mall are classified as "falsifications," despite the testimony of GM's auditors and every other GM deponent in this matter that GM found no conclusive evidence of fraud during the audit of Mall.

*Finally*, Mall retained a GM audit and warranty compliance expert in this litigation, who confirmed, within a reasonable degree of certainty, that (a) none of the repairs identified by GM's auditors as falsification are, in fact, falsifications, (b) GM's auditors made numerous inaccurate statements to justify chargebacks against Mall, including, but not limited to, referencing an outdated SP&P Manual, and (c) none of the asserted chargebacks against Mall were valid.  For these reasons, as set forth more fully below, Mall is entitled to summary judgment as to GM's unlawful chargebacks asserted against Mall.

## **PROCEDURAL HISTORY**

On September 20, 2018, Mall filed its Complaint against GM in the Superior Court of New Jersey, Law Division, Camden County. (See Docket Entry No. 1, Ex. 1). On October 18, 2018, GM removed the matter to this Court. (See Docket Entry No. 1). On November 8, 2018, GM filed its Answer to the Complaint. (See Docket Entry No. 9). On February 28, 2020, Mall filed a Motion for Partial Summary Judgment as to GM's Unlawful Termination of Mall's Motor

Vehicle Franchise (Count I). (See Docket Entry No. 75). That Motion is pending before this Court as of the date of this filing.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A non-moving party cannot simply assert or reassert factually unsupported allegations in its brief or pleading. Anderson, 477 U.S. at 249; Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). The non-moving party:

> must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

Matsushita Electric Indus. Co., Ltd. v. Zenith Radio, 475 U.S. 574, 586-87 (1986). A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude the granting of summary judgment. Id. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

## LEGAL ARGUMENT

**I.     THE NEW JERSEY FRANCHISE PRACTICES ACT PROVIDES AMONG THE STRONGEST STATUTORY PROTECTIONS TO MOTOR VEHICLE FRANCHISEES IN THE COUNTRY**

### A.     Legislative Intent

In 1971, the New Jersey Legislature enacted the NJFPA "to protect franchisees from unreasonable termination by franchisors that may result from a disparity of bargaining power between national and regional franchisors and small franchisees." N.J.S.A. 56:10-2; see also Red Roof Franchising, LLC v. Patel, 877 F. Supp. 2d 124, 137 (D.N.J. 2012) (The NJFPA was enacted "to remedy the disparity in bargaining power between franchisors and franchisees[.]"); Hagen Constr., Inc. v. Whiting-Turner Contracting Co., 2018 WL 1918470, at *3 (D.N.J. Apr. 24, 2018) ("The NJFPA governs the relationship between franchisors and franchisees and provides protection to the franchisees in an effort to balance the bargaining power between franchisors and franchisees."); Gen. Motors Corp. v. Gallo GMC Truck Sales, Inc., 711 F. Supp. 810, 814 (D.N.J. 1989) (The NJFPA "reflects the legislative concern over longstanding abuses in the franchise relationship. [] The legislature recognized the franchisor's superior bargaining position in the franchise relationship, and 'the inevitable intertwining of the franchisee's livelihood with the franchise.'"); Kubis & Perszyk Associates, Inc. v. Sun Microsystems, Inc., 146 N.J. 176, 193 (1996) (NJFPA's "basic legislative objectives [include] protecting franchisees from the superior bargaining power of franchisors … [because] the financial resources of most franchisees pale by comparison to the financial strength and profitability of their franchisors."); Tynan v. Gen. Motors Corp., 127 N.J. 269 (1992) (adopting the reasoning of the dissent stating that the NJFPA "focuses on the need to protect franchisees from inequitable

treatment by economically more powerful franchisors") (citing <u>Tynan v. Gen. Motors Corp.</u>, 248 N.J. Super. 654, 675 (App. Div. 1991) (Cohen, J., dissenting in part)); <u>Red Roof Franchising</u>, 877 F. Supp. 2d at 130 ("New Jersey has a strong policy in favor of protecting its franchisees."); <u>Bus. Store, Inc. v. Mail Boxes Etc.</u>, 2012 WL 525966, at *9 (D.N.J. Feb. 16, 2012) (The NJFPA is intended to protect New Jersey franchisees "from unfair practices by out-of-state franchisors.").[1]

The NJFPA, enacted in 1971, has since been supplemented with provisions dealing exclusively with motor vehicle franchises. <u>See</u> N.J.S.A. 56:10-7.2 to 7.4; N.J.S.A. 56:10-13 to 56:10-10-29. The New Jersey Legislature declared in N.J.S.A. 56:10-7.2, "[n]otwithstanding the enactment of the [NJFPA], inequality of bargaining power continues to exist between motor vehicle franchisors and motor vehicle franchisees." In supplementing the NJFPA, the New Jersey Legislature expressed its intent to offer "protection to the competent retailer against arbitrary actions by manufacturers who too often hold a life-and-death power over his business and his ability to serve his customers." <u>N.J. Legislative Statement</u>, L.1977, Assembly No. 1956 (May 24, 1976); <u>see also</u> <u>Liberty Lincoln-Mercury</u>, 134 F.3d at 566 ("[T]he New Jersey legislature explicitly codified its concern over the 'inequality of bargaining power ... between motor vehicle franchisors and motor vehicle franchisees.'"); <u>N.J. Legislative Statement</u>, L.2011, Assembly No. 3722 (January 20, 2011) ("Recent developments in the auto industry have highlighted the unequal bargaining position of dealers *vis-à-vis* manufacturers. Dozens of New Jersey new car dealerships and thousands of dealership jobs have been lost. New Jersey consumers and the economy have suffered as a result.").

---

[1] "Under New Jersey law, remedial statutes must be construed broadly to give effect to their legislative purpose." <u>Liberty Lincoln-Mercury v. Ford Motor Co.</u>, 134 F.3d 557, 566 (3d Cir. 1998).

As emphasized by this Court in <u>Gallo GMC Truck Sales</u>, 711 F. Supp. at 814 (Hon. Joseph H. Rodriguez, U.S.D.J) (internal citation omitted):

> Despite their common interest in the success of the [motor vehicle] franchise, the franchisor and the franchisee also have vastly divergent interests. As long as the franchisor benefits from the increased public exposure and distribution of its goods, it matters little to the franchisor whether a particular franchisee remains in business, as there will always be another franchisee available to take that place in the distribution network. [] Once a franchisee has succeeded, through the expenditure of his own efforts and capital, to establish a local reputation for the franchise name, his franchise is vulnerable to termination.

Judge Rodriguez explained, "[i]t is the potential for abuse [] which the [NJFPA] was intended to address." <u>Id.</u> The NJFPA, as amended, is regarded as among the "strongest dealer protections in the country." <u>See</u> Eric L. Chase, <u>Special Industry Laws for Car Dealers</u>, N.J. Law., February 2016, at p. 66 (2016).

**B.      Provisions Relating to Chargebacks Against Motor Vehicle Franchisees**

Under the NJFPA, "[i]f any motor vehicle franchise shall require or permit motor vehicle franchisees to perform services or provide parts in satisfaction of a warranty issued by the motor vehicle franchisor … the motor vehicle franchisor shall reimburse the motor vehicle franchisee for parts supplied and services rendered under a warranty within 30 days after approval of a claim for reimbursement." N.J.S.A. 56:10-15(f). All claims for reimbursement "shall be approved or disapproved within 30 days after receipt of the claim by the motor vehicle franchisor." <u>Id.</u> When a claim is disapproved, "the motor vehicle franchisee shall be notified in writing of the grounds for the disapproval." Id.

Further, no claim that has been approved and paid shall be charged back to the motor vehicle franchisee unless it can be shown:

7

1)  "that the claim was false or fraudulent,"

2)  "that the services were not properly performed,"

3)  "that the parts or services were unnecessary to correct the defective condition," or

4)  "that the motor vehicle franchisee failed to reasonably substantiate the claim in accordance with reasonable written requirements of the motor vehicle franchisor, provided that the motor vehicle franchisee had been notified of the requirements prior to the time the claim arose and the requirements were in effect at the time the claim arose."

Id.

## II.    MALL IS A NEW JERSEY  MOTOR VEHICLE FRANCHISE

Mall is a New Jersey corporation with its principal place of business located at 75 Haddonfield Road, Cherry Hill, New Jersey 08002. (See Concise Statement of Additional Facts ("CSAF"), at ¶1). GM designs, builds, and sells cars, trucks, crossovers, and automobile parts worldwide. (Id. at ¶4). Mall has been an authorized dealer of GM vehicles, engines, parts, and accessories in New Jersey since 1986. (Id. at ¶5).

On or about November 1, 2015, Mall and GM entered into the Dealer Sales and Service Agreement ("Dealer Agreement"), under which Mall is granted the right to sell and service GM motor vehicles and related products. (Id. at ¶6). The Dealer Agreement sets forth that Mall is subject to and must comply with various requirements of GM, including, but not limited to, the Standard Provisions of the Dealer Agreement and GM's SP&Ps Manual, as amended from time to time. (Id. at ¶¶9-10). Accordingly, Mall operates a GM motor vehicle "franchise," as described in N.J.S.A. 56:10-26, and Mall is afforded the strong statutory protections of the NJFPA.

8

**III.    GM ASSERTED $656,033.04 IN UNLAWFUL CHARGEBACKS AGAINST MALL**

Between July 2017 and October 2017, GM, through its auditors, Gary LaKemper and Carl Riley, conducted an on-site audit of Mall's warranty claims. (See CSAF, at ¶¶13-16). During the on-site audit, Mall provided GM's auditors with access to Mall's facilities and documents relating to its warranty claims. (Id.). GM's 2015 SP&Ps Manual governed the job cards subject to the audit that were generated between August 2, 2016 and September 30, 2016 and GM's 2016 SP&Ps Manual governed the job cards subject to the audit that were generated between October 1, 2016 and July 14, 2017. (Id. at ¶¶9, 11).

LaKemper and Riley prepared Auditor Notes and Status Updates, as well as a Deviation Detail Report documenting their findings. (Id. at ¶¶22, 161).  At the conclusion of the on-site audit, Lakemper and Riley failed to conduct the required audit closing meeting with Mall, wherein the audit findings would be explained, the issues would be reviewed, and the proposed chargebacks would be discussed. (See CSAF, at ¶¶17-18). Following the on-site audit, GM, through its Dealer Audit Supervisor, Catherine Snyder, conducted an office audit of Mall.  (Id. at ¶19). Snyder reviewed the notes and reports from the LaKemper/Riley audit and conducted her own independent research on Mall's warranty claims. (Id. at ¶¶19-20).

On May 30, 2018, following the 10-month audit of Mall, GM sent a Notice of Breach letter to Mall and enclosed an Audit Summary Report and Deviation Detail Report reflecting 517 alleged deviations asserted against Mall totaling $672,176.59 in chargebacks. (See CSAF, at ¶¶19-21). On May 31, 2018, Mall responded to GM's Audit Summary Report and Deviation Detail Report, addressing each claimed deviation and the reasons why each claimed deviation should be overturned and the chargebacks should not be asserted against Mall. (Id. at ¶22). On

July 31, 2018, GM sent a Notice of Termination letter to Mall and enclosed a revised Audit Summary Report and Audit Review Results reflecting 12 deviations overturned by GM and a reduction of the total chargebacks to $656,033.04. (Id. at ¶¶29-35).  Only through this litigation did GM produce a revised Deviation Detail Report reflecting the final list of purported chargebacks against Mall.  (Id. at ¶37).

GM's audit of Mall, alleged deviations of GM's Service Polices & Procedures ("SP&Ps") Manual by Mall, and purported chargebacks asserted against Mall are severely flawed and do not meet the strict criteria for lawful chargebacks against motor vehicle franchisees as set forth in N.J.S.A. 56:10-15(f) of the NJFPA. As an initial matter, while GM asserted 517 alleged deviations against Mall, 104 of those alleged deviations are duplicates. (See CSAF, at ¶39). Consequently, 413 alleged deviations were actually asserted against Mall. (Id.). Almost all of the alleged deviations asserted violations of multiple provisions of GM's SP&Ps Manual. GM's unlawful chargebacks are addressed in turn below.

### A.    Chargebacks for Handwritten Information on Job Cards

Three hundred fourteen of the 413 alleged deviations asserted against Mall involve Mall's utilization of handwritten information on job cards.  (See CSAF, at ¶40).

In GM's 2015 and 2016 SP&Ps Manuals, Section 3.1.1 provides that "Service Agents typically utilize one of three types of job card systems: Electronic, Hybrid or Paper."  (See CSAF, at ¶¶41, 46).  In GM's 2015 and 2016 SP&Ps Manuals, Section 3.1.1 states, "Hybrid repair order systems are those that utilize any combination of electronic and ***handwritten entries*** on a printed job card copy for documenting job card information." (Id. at ¶¶42, 47) (emphasis added). In GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.2 states that "[a]ll customer and vehicle information is to be completed accurately at the time of job card write-up." (Id. at ¶¶43,

48). Further, in GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.2 states that for early bird envelopes or drop-off forms, "[w]hen the customer does not provide the complete information required above on the early bird envelope or drop-off form, the required information must be entered on the job card." (Id. at ¶¶44-45, 49-50). Additionally, GM's 2016 SP&Ps Manual, Section 3.2.2 states, "[b]efore closeout of the job card, the odometer ending mileage must be recorded and transferred from the technician shop copy to all copies of the job card." (Id. at ¶51). Thus, the applicable SP&Ps Manuals expressly permit Mall's utilization of handwritten entries on its job cards.[2]

Prior to and during the audit, Mall sought clarification from JLWarranty, a third-party training program offered through GM, regarding whether GM's SP&Ps Manual permitted Mall's utilization of handwritten entries on its job cards. (Id. at ¶52). In response, JLWarranty advised that utilizing handwritten entries on job cards was not prohibited by GM's SP&Ps Manual. (Id. at ¶53).

Even more telling, GM's Auditors, Dealer Audit Administrator, District Manager, Field Warranty Manager, Regional Director, and Global Vice President all testified that utilizing handwritten information on job cards was not prohibited by GM's SP&Ps Manual. (Id. at ¶¶54-61, 65-68). For example, GM's Field Warranty Manager, who is responsible for advising and training dealers, including Mall, regarding how GM's SP&Ps Manual is to be interpreted and applied, testified:

---

[2] In GM's 2015 and 2016 SP&Ps Manuals, Section 3.1 provides, "GMs' policies for Service Agent records in support of service transactions are intended to be flexible and adaptive given the potential variables which may exist, such as dealership size and/or volume, type of repair order and transaction processing systems, etc." (See CSAF, at ¶¶124, 126).

11

> Q.      Where in the Service Policies and Procedures Manual does it prohibit the handwriting of accurate mileage number on a work order?
>
> **A.      It doesn't prohibit it.**

(Id. at ¶55). GM's Global Vice President for Customer Care and Aftersales testified:

> Q.      Okay. Now you made a reference to mileage on work orders. Is there a strict prohibition in the policies and procedures manual against handwritten mileage on a work order?
>
> MR. MCGRATH:     Objection to the term – to the language. You can answer.
>
> **A.      The answer is no.**

(Id. at ¶59). GM's Dealer Audit Administrator testified:

> Q.      All right. And it doesn't say anywhere here in 3.2.2 that the dealership is prohibited from writing in the accurate mileage, correct?
>
> MR. MCGRATH: Objection. I mean, that's probably the sixth time you've asked this question now.
>
> BY MR. TAMBUSSI:
>
> Q.      You can answer it.
>
> **A.      You can handwrite a mileage….**

(Id. at ¶66). GM's Regional Director of Chevrolet Sales & Service, and the individual who made the decision to terminate Mall's franchise, testified:

> Q.      Okay. Now, is there any prohibition in the policies and procedures manual for service that GM issues to its dealers that prohibits the use of writing mileage onto a work order?
>
> MR. MCGRATH:     Objection. You can answer.
>
> **A.      No.**
>
> ***
>
> Q.      Okay. Now, where in the policies and procedures manual does it state that writing the mile -- the accurate mileage of a vehicle is prohibited on a job card?
>
> MR. MCGRATH: Objection. You can answer.
>
> **A.      It's not prohibited….**
>
> Q.      Okay. Thank you. And in fact, what GM wants to do is get the accurate mileage on the job cards; correct?
>
> **A.      It wants accurate information on the top of the repair order.**

12

> Q.      Okay.
> **A.      Including mileage.**
> Q.      Okay. And it doesn't matter whether the information is typed or written as long as it's accurate; correct?
>           MR. MCGRATH: Objection. Objection. You can answer.
> **A.      That's correct.**

(<u>Id.</u> at ¶68).

Despite classifying some of the alleged "handwritten information" deviations as "falsifications," auditors LaKemper and Riley admitted they had no indication that any of the handwritten information on Mall's job cards was incorrect.  (<u>Id.</u> at ¶¶62-63). For example, Auditor LaKemper testified:

> Q.      Was there any indication, did you have any facts or reason to believe that the information that was handwritten was false?
> **A.      I don't believe so.**
> Q.      You don't believe that it was false or you don't believe you had --
> **A.      You asked me if it was false, I said I don't believe so.**
> Q.      You would agree with me, would you not, that GM, in looking at the job cards, wants to make sure that there is complete information, correct?
> **A.      That who does?**
> Q.      That GM wants to make sure that there is complete information on the job cards?
> **A.      Yes.**

(<u>Id.</u> at ¶64).

Additionally, David Henson, an expert in GM audits and warranty compliance, confirmed, within a reasonable degree of certainty, that Mall's utilization of handwritten information on job cards was permitted under GM's SP&Ps Manual. (<u>Id.</u> at ¶172). Expert Henson stated:

> Regarding handwritten entries, Mr. LaKemper stated only a specific portion of a hybrid repair order is allowed to be handwritten, even though the Policy and Procedure Manual states:

13

"Hybrid repair order systems are those that utilize any combination of electronic and handwritten entries on a printed job card copy for documenting job card information." As a common practice, technicians are required to record the final "out" mileage on the repair order. Depending on the Dealership Management System—as is the case with this dealership's DMS—this is usually in the upper portion of the repair order and handwritten.

(Id.). Expert Henson also stated, "[a]lthough the auditors suggested there was noncompliance related to handwritten mileage entries, the P&P stated the mileage 'must be correct at time of write-up' and makes no mention of handwritten entries, except to say they are acceptable in Article 3.1.1." (See Ex. 32, at p. 11).

In sum, 314 of the 413 alleged deviations asserted against Mall involve Mall's utilization of handwritten information on job cards, despite (a) GM's SP&Ps Manual expressly permitting handwritten entries on job cards, (b) GM's auditors and other deponents admitting that handwritten entries on job cards was not prohibited by GM's SP&Ps Manual, and (c) GM's third-party training program specifically advising that handwritten entries on job cards was permitted under GM's SP&Ps Manual. Accordingly, GM's asserted chargebacks against Mall for Mall's utilization of handwritten information on job cards are unlawful under N.J.S.A. 56:10-15(f) and must be overturned.

### B.    Chargebacks for Improper Service Management Authorizations

Three hundred forty-four of the 413 alleged deviations asserted against Mall involve "improper service management authorizations" by Mall's service dispatchers. (See CSAF, at ¶69).

Mall's service dispatchers are paid on both an hourly and salaried basis dependent on the particular employee, years of experience, and other factors. (Id. at ¶78).[3] Despite the variation in their pay structures, all of Mall's service dispatchers are expressly classified as "supervisory" employees pursuant to their job description and duties. (Id. at ¶78). For example, in the Service Dispatcher Job Description, the "Essential Duties" include: "*[s]upervise and manage department*." (Id. at ¶79) (emphasis added). Specifically, Mall's service dispatchers are in charge of assigning and delegating work to the other employees in the service department, have the authority to hire and fire other employees at Mall, including technicians, lot attendants, and shuttle drivers, and coordinate required training for the technicians. (Id. at ¶¶80-82).

In GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.4 states, "[a]uthorization [for repairs] must be obtained at initial write-up and prior to any repairs being performed…. Any changes regarding who is responsible for the charges require service management authorization prior to repairs being performed." (See CSAF, at ¶¶72, 75). In GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.4 states that "[i]f Service Agent is unable to obtain a customer signature, *service management* must state the reason and sign on the authorization line on the job card, prior to any repairs being performed." (Id. at ¶¶73, 76) (emphasis added). In GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.13 provides:

> Service Agent must designate one person who is ultimately responsible and accountable for the management of warranty expense. *All approvals must be issued by service management. When portions of responsibilities are delegated to other members of management (e.g. Shop Foreman), those members must comply with GM Service Policies and Procedures requirements. Service technicians, warranty administrators, or non-supervisory hourly personnel must not be empowered for these types of*

---

[3] Mall's Service Dispatchers are also sometimes referred to as Production Managers and/or Shop Foremen.

*management approvals.*

(Id. at ¶¶74, 77) (emphasis added). Thus, the applicable SP&Ps Manuals expressly permit supervisory hourly and supervisory salaried employees, such as Mall's service dispatchers, to provide service management authorizations.[4]

As an initial matter, in 370 entries on GM's Revised Deviation Detail Report, auditors LaKemper and Riley noted that the service management authorizations must be made by a "salary employee" or a "supervisory employee."   (Id. at ¶70). The 2015 and 2016 SP&Ps Manuals do not contain the word "salary" or "salaried," and only state that "non-supervisory hourly personnel must not be empowered for these types of management approvals." (Id. at ¶¶74, 77). In 455 entries on GM's Revised Deviation Detail Report, auditors LaKemper and Riley noted that the service management authorizations must be made by the "service manager."  (Id. at ¶71). The 2015 and 2016 SP&Ps Manuals expressly state that "service management" (plural) authorizations must be provided, and that is not limited to the "service manager." (Id. at ¶73-74, 76-77).

During the audit, Mall sought confirmation from GM's Regional Service Manager and Regional Warranty Manager that Mall's service dispatchers were permitted to provide service management authorizations pursuant to GM's SP&Ps Manual. (Id. at ¶¶83-86). In an internal GM e-mail regarding Mall's inquiry, GM's Regional Service Manager stated,

> Per our conversation, Craig is looking for clarity regarding who is
> eligible to sign repair orders other than the service manager. His
> concern was that our policy isn't clearly stated in P&P…. *I*

---

[4] In GM's 2015 and 2016 SP&Ps Manuals, Section 3.1 provides, "GMs' policies for Service Agent records in support of service transactions are intended to be flexible and adaptive given the potential variables which may exist, such as dealership size and/or volume, type of repair order and transaction processing systems, etc." (See CSAF, at ¶¶124, 126).

> *understand the conflict an hourly/commission based person would cause, but where is it "clearly" written in the P&P?*

(Id. at ¶87) (emphasis added). In response to that e-mail, auditor LaKemper e-mailed GM's Dealer Audit Supervisor stating, "***I do not have a good answer for Steven***. Can you answer his question or forward it to Steve Oakley." (Id. at ¶88). In response to auditor LaKemper's e-mail, GM's Dealer Audit Supervisor e-mailed LaKemper, as well as GM's Warranty Administrator and GM's Director of Global Dealer Service & Warranty Operations, stating, "***This is a question that will have to be answered by Mark and Steve***. We are just collecting the information of the pay plan so they can make an informed decision." (Id. at ¶89) (emphasis added).[5]

Following Mall's inquiry and the internal GM e-mail exchange, GM requested and Mall provided the pay plans and job description for Mall's service dispatchers, which set forth that while Mall's service dispatchers are paid on both an hourly and salaried basis, they are all classified as "supervisory" employees pursuant to their job description and duties. (Id. at ¶90). Thereafter, in November 2017, following the conclusion of GM's on-site audit of Mall, GM was still sending internal e-mails questioning whether Mall's service dispatchers were permitted to provide service management authorizations pursuant to GM's SP&Ps Manual and whether such authorizations should be asserted as chargebacks against Mall. (Id. at ¶91).

Even more telling, GM's Auditors, Dealer Audit Supervisor, Dealer Audit Administrator, District Manager, Field Warranty Manager, Regional Director, and Global Vice President all testified that the applicable editions of GM's SP&Ps Manual does not preclude Mall's service dispatchers from being considered "service management" for purposes of providing

---

[5] GM's Dealer Audit Supervisor also testified at her deposition that throughout the audit of Mall, "it was an open question" internally within GM in regards to whether Mall's service dispatchers were authorized to provide service management authorizations. (See CSAF, at ¶101).

authorizations. (<u>Id.</u> at ¶¶92-96, 98-104, 110-112). For example, GM's Global Vice President for Customer Care and Aftersales testified:

> Q.     All right. Now, in the second full paragraph, it states, service technicians, warranty administrators, or nonsupervisory hourly personnel must not be empowered for these types of management approvals. Did I read that correctly?
> **A.     Yes, you did.**
> Q.     Is there any prohibition of dispatchers in those words?
>         MR. MCGRATH:  Objection. You can answer.
>         **THE WITNESS:  It would depend on whether or not the dispatcher was a nonsupervisory hourly personnel.**
>         BY MR. TAMBUSSI:
> Q.     Okay.  But it doesn't even mention the word dispatcher there, does it?
> **A.     But there's many provisions it doesn't mention.**
> Q.     Right.
> **A.     That's why it specifically calls out if they're nonsupervisory hourly personnel, because there are numerous positions that can exist within a dealership.**
> Q.     Right.  So one would have to look at the job duties of a particular position to see whether the person fits in the category, correct?
>         MR. MCGRATH:  Objection. You can answer.
>         **THE WITNESS:  Again, I would say is it a nonsupervisory hourly personnel.**
>         BY MR. TAMBUSSI:
> Q.     Okay. All right.  So supervisory hourly employees are permitted, correct?
>         MR. MCGRATH:  Objection. You can answer.
>         **THE WITNESS:  Supervisory employees would be allowed if designated.**

(<u>Id.</u> at ¶96). GM's Dealer Audit Administrator testified:

> Q.     Does it say anywhere in these two service policies and procedures manuals that a dispatcher cannot provide authorization for repairs?
> **A.     I do not believe it specifically states dispatcher.**
>                                 ***
> Q.     Does that Section 3.2.13 mention the word dispatcher even one time?
> **A.     No.**

18

> Q.     Does that Section 3.2.13 say that a dispatcher cannot give service management approval?
>> MR. MCGRATH: Objection. Does it have those words.
>> MR. TAMBUSSI: Does it have those words?
> **A.     It does not have those words.**

(Id. at ¶104). GM's Regional Director of Chevrolet Sales & Service, and the individual who made the decision to terminate Mall's franchise, testified:

> Q.     And if, in fact, a dispatcher is considered as a supervisory employee, that dispatcher would be authorized under that sentence [of GM's SP&Ps]; correct?
>> MR. MCGRATH: Objection. You can answer.
> **A.     Yes, sir.**

(Id. at ¶112).

Auditors LaKemper and Riley also testified that during the audit, they made no inquiries as to the job duties of Mall's service dispatchers in regards to whether they would be authorized to provide service management authorizations pursuant to the applicable edition of GM's SP&Ps Manual. (Id. at ¶99). GM's Dealer Audit Administrator, who reviewed Mall's Response to GM's Notice of Breach and only overturned 12 deviations, testified that he was unaware of the job duties of Mall's service dispatchers, that he never visited or spoke with anyone at Mall, and that he never spoke with anyone at GM regarding whether they provided directions to Mall that its service dispatchers were authorized to provide service management authorizations. (Id. at ¶¶105-108). In fact, GM's Dealer Audit Administrator testified that if he reviewed the job duties for the service dispatchers at Mall, he would have determined that they were authorized to provide service management authorizations pursuant to the applicable edition of GM's SP&Ps Manual, and he would have overturned a vast majority of the chargebacks asserted against Mall. (Id. at ¶109).

Further, GM's regional employees, who are responsible for advising and training dealers, including Mall, regarding how GM's SP&Ps Manual is to be interpreted and applied, testified that they were aware of and permitted Mall's service dispatchers to provide service management authorizations pursuant to the applicable edition of GM's SP&Ps Manual well before the audit commenced and the subject job cards were generated. (Id. at ¶¶92-94). GM's District Manager admitted there are many "*different interpretations*" of the "service management" provision in GM's SP&Ps Manual, and acknowledged it would not be fair to penalize Mall as a result of these ambiguities. (Id. at ¶¶93-94). In fact, in a 2017 internal training PowerPoint, GM conceded that although the GM Warranty Support Center "coaches dealers to be compliant with GM's Policies & Procedures … [it] lack[s] consistency when coaching dealers on proper authorization methods…. [and it] sometimes instruct[s] dealers to do things that would still result in a debit." (Id. at ¶97) (also stating that "[w]hen two GM representative are giving conflicting advice to dealers it makes us all look bad.").

Additionally, expert Henson confirmed, within a reasonable degree of certainty, that Mall's service dispatchers were permitted to provide service management authorizations pursuant to the applicable editions of GM's SP&Ps Manual. (Id. at ¶172). Expert Henson noted that auditors LaKemper and Riley applied an inapplicable 2013 edition of GM's SP&Ps Manual to assert these chargebacks against Mall. (Id.). Expert Henson stated:

> It is clear the Production Manager and Shop Foreman/Dispatcher fell within GM's definition of "service management" during the audited time frame and the auditors have applied a policy from the 2013 Policy & Procedure Manual, which was outdated for this audit time frame.

20

(Id.).[6]

In sum, 344 of the 413 alleged deviations asserted against Mall involve "improper service management authorizations" by Mall's service dispatchers, despite (a) GM's SP&Ps Manual permitting supervisory employees, such as Mall's dispatchers, to provide service management authorizations, (b) GM's management internally acknowledging ambiguities in GM's SP&Ps Manual and questioning whether Mall's dispatchers should be permitted to provide service management authorizations throughout the audit, (c) Mall's regional personnel admitting that they previously permitted Mall's dispatchers to provide service management authorizations, (d) GM's auditors and other deponents admitting that GM's SP&Ps Manual does not prohibit Mall's dispatchers from providing service management authorizations, and (e) GM's utilization of an inapplicable 2013 SP&Ps Manual to justify its purported chargebacks. Accordingly, GM's asserted chargebacks against Mall for "improper service management authorizations" are unlawful under N.J.S.A. 56:10-15(f) and must be overturned.

### C.     Chargebacks for No Delivery Date on Job Cards

Two hundred twenty-six of the 413 alleged deviations asserted against Mall involve "no delivery date" on Mall's job cards. (See CSAF, at ¶113).

In GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.2 provides that "[a]ll customer and vehicle information is to be completed accurately at the time of job card write-up" and must include the following:

- Job Card date including month, day and year (MM/DD/YYYY)

---

[6] Expert Henson noted that under the inapplicable 2013 SP&Ps Manual only "salaried members of the service management team" were permitted to provide service management authorizations. (See Ex. 32, at pp. 8-11). He noted that subsequent editions of GM's SP&Ps Manuals, including the applicable 2015 and 2016 editions, revised the language to allow for "supervisory hourly personnel" to provide service management authorizations. (Id.).

- Complete VIN (one vehicle per job card)
- Odometer reading taken from the vehicle (do not record tenths)
- ***Delivery or in-service date (as applicable)***
- Owner/lessee name (or operator) and contact information
- Service Advisor ID (name or code)
- Customer authorization to perform repairs (refer to Article 3.2.4 for details).

(Id. at ¶¶114-115) (emphasis added). Thus, the applicable SP&Ps Manuals require that the delivery date for each vehicle serviced and/or repaired by Mall be recorded accurately and included with the corresponding job card.[7]

The delivery dates of the vehicles that were serviced and/or repaired by Mall were included on the Vehicle Information Service System ("VISS") pages, which were attached to each job card generated by Mall.  (Id. at ¶116). This is not in dispute.

Auditors LaKemper and Riley testified that although the VISS pages may have been attached to each job card generated by Mall and although the VISS pages may have included the delivery date for each vehicle repaired or serviced by Mall, the auditors do not make copies of and/or review the attached VISS pages as part of their audit, and they will still write up a deviation for "no delivery date on job card."  (Id. at ¶117). Auditor Riley testified:

> Q.    Okay. So the information could be in the file, you as an auditor look at it, you see that on the electronic Repair Order the delivery date is missing, but you know that the delivery date is in the file.
> **A.    Yeah.**
> Q.    You still write that up as a deviation?
> **A.    Yes.**
> Q.    Okay. You don't write it up as a falsification, do you?

---

[7] In GM's 2015 and 2016 SP&Ps Manuals, Section 3.1 provides, "GMs' policies for Service Agent records in support of service transactions are intended to be flexible and adaptive given the potential variables which may exist, such as dealership size and/or volume, type of repair order and transaction processing systems, etc." (See CSAF, at ¶¶124, 126).

> **A.      I don't know. It's typically not. Typically it's written up as missing vehicle details.**

(Id. at ¶118).  More simply stated, although the delivery dates are to be included with every job card under GM's SP&Ps Manual, and although Mall included the delivery dates on the VISS page attached to each and every job card, GM still asserts chargebacks against Mall because the delivery date was not typed directly onto the job card (which is not required), and auditors Lakemper and Riley neglected to make copies of and review the VISS pages attached to the job cards.

Additionally, expert Henson confirmed, within a reasonable degree of certainty, that GM's SP&Ps Manual does not require the delivery date to be printed directly onto the job card, and that attaching the VISS page (including the delivery date) with the job card is standard practice in the automotive service industry. (Id. at ¶172; see also Ex. 32, at pp. 13-14). Expert Henson stated:

> In an effort to find every reason possible to debit a claim, the auditors used Article 3.2.2 of the Policy & Procedure Manual to debit claims where this information was not electronically printed directly to the repair order…. Instead, as a component of the repair order required documents, the dealer had an Investigate Vehicle History (IVH), or Workbench [VISS] printout attached that showed the delivery date. This document is printed at time of write-up and to avoid unnecessary delays in getting the customer in and out, it is retained with the repair order in the VIN history file as a physical element of that repair order.
>
> In other words, the Delivery Date is well established before any repairs have begun, although it is on a separate document that is part of the write-up process.
>
> The auditors often stated because no delivery date (D.O.D.) was noted on the repair order the "Vehicle presence not substantiated; vehicle details on Job Card (RO) no Delivery Date." This is

23

> preposterous and does not bring into question the vehicle's presence, as there is absolutely no correlation between the two.
>
> In 25 years in business, this is the first time I've seen debits of this nature from any manufacturer. The vehicle is either in warranty— or it is not—and that is ultimately determined by IVH or Workbench—not what may be printed on the repair order.

(See Ex. 32, at pp. 13-14).

In sum, 226 of the 413 alleged deviations asserted against Mall involve "no delivery date" on Mall's job cards, despite (a) the delivery dates being attached to each job card generated by Mall as required under GM's SP&Ps Manual, and (b) GM's auditors admitting that the delivery dates were attached to each job card generated by Mall, but overlooked by the auditors. Accordingly, GM's asserted chargebacks against Mall for "no delivery date" on Mall's job cards are unlawful under N.J.S.A. 56:10-15(f) and must be overturned.

## D.    Chargebacks Involving Citations to Provisions in Inapplicable Editions of GM's SP&Ps Manual and/or Non-Existent Provisions of GM's SP&Ps Manual

At least 101 of the 413 alleged deviations asserted against Mall involve GM's citation to provisions in inapplicable editions of GM's SP&Ps Manual and/or provisions that are nowhere to be found in any recent edition of GM's SP&Ps Manual. (See CSAF, at ¶119). Those alleged deviations are addressed in turn below.

### 1.    Citations to Section 1.6.2.2

Sixty-nine of the 413 alleged deviations asserted against Mall involve GM's citation to Section 1.6.2.2 of its SP&Ps Manual. (See CSAF, at ¶120).

There is no Section 1.6.2.2 found in GM's 2015 SP&Ps Manual. (Id. at ¶121). There is no Section 1.6.2.2 found in GM's 2016 SP&Ps Manual.  (Id. at ¶122). Expert Henson stated that

24

Section 1.6.2.2 "was present in the 2013 and 2014 Policy & Procedure Manuals, but that Article number was purged from the later Manuals and non-existent during the audit scope." (See Ex 32, at p. 11). The auditors admitted that there is no Section 1.6.2.2 in the applicable SP&Ps Manual and that their "***advice to the dealer was incorrect.***" (See CSAF, at ¶¶143-44) (emphasis added).

GM's asserted chargebacks for deviations of the non-existent Section 1.6.2.2 are unlawful and must be overturned.

### 2.    *Citations to Section 3.1*

Twenty of the 413 alleged deviations asserted against Mall involve "failure to provide original job cards" and/or for providing "reprints" of job cards.  (See CSAF, at ¶123).

In GM's 2015 and 2016 SP&Ps Manuals, Section 3.1 states, "Service Agent must be able to produce, in paper form, the originals ***or genuine copies of the original documents*** for all records needed to support the services transactioned and submitted to GM."  (Id. at ¶¶125, 127; see also id. (stating, "Service Agent must retain records to substantiate their transactions."); id. (stating that records must be retained and copies must be provided to GM representatives upon request, including copies of job cards) (emphasis added)).

Thus, the applicable SP&Ps Manuals expressly permit dealers, such as Mall, to provide genuine copies of job cards and other service records to GM upon request. The applicable SP&Ps Manuals do not require dealers to provide original job cards. GM's asserted chargebacks for "failure to provide original job cards" and/or for providing "reprints" of job cards are unlawful and must be overturned.

25

### 3. Citations to Section 3.2.9

Six of the 413 alleged deviations asserted against Mall involve "no technician time ticket on job card." (See CSAF, at ¶128).

In GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.9 provides that "[a]ll standard warranty and policy repair time must be documented ***on the technician's time ticket by job card***." (Id. at ¶¶129-130) (emphasis added). In GM's 2015 and 2016 SP&Ps Manuals, Section 3.2.9 further provides that "[a]ll warranty and policy repair time for any customer concerns added to the job card (add-ons) after the initial job card write-up, and other labor hours (OLH) must have individual and specific on/off punch times ***on the technician's time ticket by job card line*** for repair(s) performed." (Id.) (emphasis added).

Thus, the applicable SP&Ps Manuals do not require that technicians' time tickets be physically placed onto each job card. Instead the applicable SP&Ps Manuals require that the technicians' repair time be documented on his/her time ticket by job card. GM's asserted chargebacks for "no technician time ticket on job card" are unlawful and must be overturned.

### 4. Citations to Section 1.4

Four of the 413 alleged deviations asserted against Mall involve GM's citation to Section 1.4 of GM's SP&Ps Manual, effective October 1, 2016 for job cards that were created prior to October 1, 2016. (See CSAF, at ¶131).

GM's 2015 SP&Ps Manual, Section 1.4 states that for rental vehicles provided to customers, "[s]ervice management approval is required for rentals in excess of 3 days. ***GM authorization is required on any rental of 6 or more days.***" (Id. at ¶133; see also id. (stating, "[r]entals for 6 or more days require GM authorization."); id. (stating, "[s]ervice Management

approval is required for rentals in excess of 3 days. GM authorization is required on any rental of 6 or more days.") (emphasis added)). GM's 2016 SP&Ps Manual, Section 1.4 states that for rental vehicles provided to customers, "***GM authorization is required on any rental exceeding 3 days***. Approval is required prior to transaction submission." (Id. at ¶135; see also id. (stating, "[r]entals exceeding 3 days require GM authorization."); id. (stating, "[r]entals in excess of 3 days require DMA/DMC approval prior to transaction submission.") (emphasis added)). Thus, GM approval was required for rentals exceeding 5 days on job cards generated between August 2, 2016 and September 30, 2016, and GM approval was required for rentals exceeding 3 days on job cards generated between October 1, 2016 and July 14, 2017. (Id. at ¶¶9, 11).

Despite this, GM asserted chargebacks against Mall for not obtaining GM approval for rentals of 4 and 5 days on job cards generated prior to October 1, 2016 and therefore subject to GM's 2015 SP&Ps Manual, which only required GM approval for rentals exceeding 5 days. (Id. at ¶136). By way of example, for Repair Order No. 05-70335, GM asserted a chargeback against Mall for "[n]o DMA [GM's District Manager of Aftersales] approval for Rental 5 days" on a job card generated on June 24, 2016, prior to GM's 2016 SP&Ps Manual going into effect. (Id.). For Repair Order No. 05-73501, GM asserted a chargeback against Mall for "no required GM DMA authorization [for a 5 day rental]" on a job card generated on August 19, 2016, prior to GM's 2016 SP&Ps Manual going into effect. (See Ex. 8, at p. 3). For Repair Order No. 05-74436, GM asserted a chargeback against Mall for "[n]o approval for 5 day rental" on a job card generated on August 31, 2016, prior to GM's 2016 SP&Ps Manual going into effect. (Id. at p. 5). For Repair Order No. 05-74991, GM asserted a chargeback against Mall for "[n]o DMA approval for

5 day Rental vehicle claimed" on a job card generated on September 8, 2016, prior to GM's 2016 SP&Ps Manual going into effect. (Id. at p. 6).

GM's asserted chargebacks involving the auditors' citation to Section 1.4 of GM's SP&Ps Manual, effective October 1, 2016 for job cards that were created prior to October 1, 2016 are unlawful and must be overturned.

### 5.   Citations to Section 3.2.12

Two of the 413 alleged deviations asserted against Mall involve GM's citation to Section 3.2.12 of GM's SP&P's Manual, effective October 1, 2016 for job cards that were created prior to October 1, 2016.  (See CSAF, at ¶137).

GM's 2015 SP&P Manual, Section 3.2.12 states:

> Any warranty/policy concern not expressed orally or in writing by the customer at initial write-up must be first inspected and verified by the service manager before it is added to the job card. If the service manager determines that the additional repair is necessary, he/she must be the person who adds it to the job card…. The service manager must also document the date, time, signature (or initials) and explanation in detail what was inspected and why additional repair is needed on the job card prior to the work being performed…. The customer must be contacted prior to work being performed for their permission to continue with the repair(s).

(Id. at ¶138). GM's 2016 SP&P Manual, Section 3.2.12 states:

> Any warranty/policy concern not expressed orally or in writing by the customer at initial write-up must be first inspected and verified by the service manager before it is added to the job card. If the service manager determines that the additional repair is necessary, he/she must be the person who adds it to the job card…. The service manager must also document the date, time, signature (or initials) and explanation in detail what was inspected and why additional repair is needed on the job card prior to the work being performed…. The customer must be contacted prior to work being performed for their permission to continue with the repair(s). ***The date and time the customer provided permission must be***

28

**documented on the job card.**

(Id. at ¶139) (emphasis added). Thus, for job cards generated prior to October 1, 2016, it was not a requirement that "the date and time the customer provided permission must be documented on the job card." (Id. at ¶¶9, 11).

Despite this, GM asserted chargebacks against Mall for "no customer date/time for add-on" on job cards generated prior to October 1, 2016 and therefore subject to GM's 2015 SP&Ps Manual, which did not have this requirement. (Id. at ¶140). By way of example, for Repair Order No. 05-72023, GM asserted a chargeback against Mall for "[n]o customer date/time for add/on" on a job card generated on July 21, 2016, prior to the October 1, 2016 GM SP&Ps Manual going into effect.  (Id.). For Repair Order No. 05-75490, GM asserted a chargeback against Mall for "[n]o customer contact date/time for add-on" on a job card generated on September 12, 2016, prior to the October 1, 2016 GM SP&Ps Manual going into effect. (See Ex. 8, at p. 8). The auditors admitted to utilizing the inapplicable SP&Ps Manual in regards to these deviations. (See CSAF, at ¶141).

GM's asserted chargebacks involving the auditors' citation to Section 3.2.12 of GM's SP&Ps Manual, effective October 1, 2016 for job cards that were created prior to October 1, 2016 are unlawful and must be overturned.

In sum, at least 101 of the 413 alleged deviations asserted against Mall involve GM's citation to provisions in inapplicable editions of GM's SP&Ps Manual and/or provisions that are nowhere to be found in any recent edition of GM's SP&Ps Manual, and GM's auditors admitted to these crucial errors during the audit of Mall. (Id. at ¶142). In addition to the auditors' admissions, GM's Dealer Audit Supervisor, Dealer Audit Administrator, and Regional Director

29

all acknowledged that auditors LaKemper and Riley made numerous mistakes during the audit of Mall by citing to provisions in inapplicable editions of GM's SP&Ps Manual and/or provisions that are nowhere to be found in any recent edition of GM's SP&Ps Manual. (Id. at ¶¶145-149). For example, GM's Dealer Audit Supervisor testified:

> Q.    Okay.    And the audit documentation is the documentation provided to you by Mr. LaKemper and Mr. Riley?
> MR. MCGRATH:  Objection. You can answer.
> **THE WITNESS:  This would be a summary report of their work, correct.**
> BY MR. TAMBUSSI:
> Q.    Okay.  And behind that summary report is a debit deviation report consisting of multiple pages. Is that the information provided to you by Mr. LaKemper and Mr. Riley?
> **A.    Correct.**
> Q.    Okay. And in that debit deviation report, Mr. LaKemper and Mr. Riley put repair order-level comments, right?
> **A.    Correct.**
> Q.    And that's where they identify the portion of the policy and procedures manual applicable to the documents that they find have been deviated from, correct?
> **A.    Correct.**
> Q.    And that's where they're supposed to put the accurate policy and procedures manual references, correct?
> **A.    Correct.**
> Q.    And if they put policy and procedure manual references that don't exist, that would be mistakes on their part, correct?
> **A.    Yes.**
> ***
> Q.   So you would agree with me that Section 1.6.2.2 is contained in neither Exhibit 72, the 2015 service policies and procedures manual, nor Exhibit 73, the 2016 service policies and procedures manual?
> **A.  I would agree.**
> Q.  Okay.  And you expect that your auditors, as they go out into the field, to be up to date on the current policies --
> **A.  Right.**
> Q.    -- of this policies and procedures manual –
> MR. MCGRATH:  Let him finish his question.
> BY MR. TAMBUSSI:
> Q.    -- correct?

30

A.    That is correct.

(Id. at ¶146). Further, GM's Dealer Audit Administrator conceded that if he noticed the auditors'

mistakes during his review and/or reviewed Mall's response to GM's Notice of Breach more

closely he would have overturned numerous chargebacks asserted against Mall.  (Id. at ¶148).

GM's Regional Director, who made the ultimate decision to terminate Mall's franchise, testified

that he never checked or inquired into the foundation or underlying basis for the audit findings.

(Id. at ¶150).

Additionally, expert Henson confirmed, within a reasonable degree of certainty, that

auditors LaKemper and Riley made numerous mistakes during the audit of Mall by citing to

provisions in inapplicable editions of GM's SP&Ps Manual and/or provisions that are nowhere to

be found in any recent edition of GM's SP&Ps Manual. (Id. at ¶172). Expert Henson stated, "[i]t

is also my opinion, within a reasonable degree of professional certainty, the auditors made

numerous inaccurate statements to justify chargebacks, including, but not limited referencing an

outdated Policy & Procedure Manual." (Id.).  Expert Henson further stated that the work of

auditors LaKemper and Riley:

> is indicative of a sloppy audit, with little regard to the Policy &
> Procedure Manual in effect at the time, applying debits to
> legitimate claims using invalid reasoning, misunderstanding of
> dealership operations, falsely stating they had "confirmed"
> something that did not happen, manipulating screenshots, stating
> non-existent rules applied and using irrelevant policy to suggest
> the vehicle's presence at the dealership could not be established,
> etc.

(Id.).

Accordingly, GM's asserted chargebacks against Mall involving citations to provisions in

inapplicable editions of GM's SP&Ps Manual and/or provisions that are nowhere to be found in

31

any recent edition of GM's SP&Ps Manual are unlawful under N.J.S.A. 56:10-15(f) and must be overturned.

      **E.    Falsification Chargebacks**

Fifty-three of the 413 alleged deviations asserted against Mall are classified as "falsifications." (See CSAF, at ¶152).

Of the 53 alleged "falsification" deviations, 51 involve alleged "handwritten information," "improper service management authorizations," and/or "no delivery date." (Id. at ¶153). Of the 53 alleged "falsification" deviations, at least 16 involve GM's citation to provisions in inapplicable editions of GM's SP&Ps Manual and/or provisions that are nowhere to be found in any recent edition of GM's SP&Ps Manual. (Id. at ¶154).

Further, despite asserting alleged "falsification" chargebacks against Mall, GM's Auditors, Dealer Audit Supervisor, Dealer Audit Administrator, all Regional Director all testified that GM found no conclusive evidence of fraud during the audit of Mall. (Id. at ¶¶155-170). For example, auditors LaKemper and Riley testified that during the audit of Mall, they found no conclusive evidence that Mall submitted claims to GM for warranty reimbursement on vehicles that were not physically present at Mall. (Id. at ¶¶155-157). Auditor LaKemper testified:

> Q.    Okay. Did you ever check the cars to determine whether or not the mileage was incorrect as written in?
> **A.    That could not be done.**
> Q.    Why not?
> **A.    This is history. What I looked at was a history. These cars were no longer at the dealership.**
> Q.    Did you ever check to see if any of the cars were still at the dealership?
> **A.    No, they were not.**
> Q.    Well, no, that's not my question. Did you ever check to see if any of the cars were at the dealership?
> **A.    Because of the scope of the audit, these vehicles were not at the dealership. These claims had been completed. So if**

32

**they're completed, that means the customers come and picked up the car and the claim has been paid. We only look at paid claims.**

Q.    Let me try it again. Did you ever check to determine if any of the cars were at the dealership?

**A.    It was impossible to check.**

Q.    The answer is no?

**A.    No. The answer is they were not there to be checked.**

Q.    Did you ever make any effort to check to see if any of the cars were present?

    MR. McGRATH: Objection. Asked and answered. You can answer.

    **THE WITNESS: You're asking the same question and my answer is still the same. These claims were paid, the claims were completed, the cars were gone.**

(Id. at ¶156). Auditor Riley testified:

Q.    Okay. What facts do you have that a car for which a Repair Order Warranty Claim was submitted was not at Mall Chevrolet?

    MR. STARK: Objection.

    MR. TAMBUSSI: Facts.

    MR. STARK: Objection.

    **THE WITNESS: I just have unusual facts.**

    BY MR. TAMBUSSI:

Q.    Well, I'm looking for facts. Just tell me the facts. Somebody else can characterize them as usual or unusual.

**A.    It goes back to if you have a car there, you would have all this other information and if it's not there, the assumption is the car isn't there.**

Q.    So you were just making assumptions that cars weren't there?

    MR. STARK: Objection.

    **THE WITNESS: I would say I am making a very strong assumption.**

    BY MR. TAMBUSSI:

Q.    But it's an assumption nonetheless, correct?

    MR. STARK: Objection.

    **THE WITNESS: I can't say I saw the car roll in, so, yeah.**

    BY MR. TAMBUSSI:

Q.    Well, you can't say you saw any of these cars roll in, correct?

**A.    True.**

> Q.      You conducted an audit months after the cars -- the Repair Orders were submitted, right?
>
> **A.      The context I'm coming from, why isn't it noted when it should be and they do it on many but not all, and all of these same Repair Orders have the same things missing, which is extremely odd.**
>
> Q.      But it doesn't create a fact, does it; it may be odd, but it's not a fact?
>
> **A.      Agreed.**

(<u>Id.</u> at ¶157). In fact, both auditors testified that they could not even define the words "fraud" or "misrepresentation," that they were not trained by GM or provided any materials on the terms "fraud" or "misrepresentation," and that they held no certifications in examining fraud.  (<u>Id.</u> at ¶¶158-159). The auditors also confirmed that the Auditor Notes and Status Updates, which were prepared and updated contemporaneously during the audit of Mall, did not contain reference to even a suspicion of fraud or a suspicion that warranty reimbursement claims were submitted to GM for vehicles not physically present at Mall.  (<u>Id.</u> at ¶¶160-163).

By way of further example, GM's Dealer Audit Administrator testified:

> Q.      Did you make any finding of fraud in your review of the audit?
>
> **A.      In my portion, I did not see that.**
>
> Q.      Did you make any finding that any claim was false in your portion of your involvement in this audit?
>
> **A.      No.**
>
> Q.      Okay…. Did you make any determination in your role in the performance of the Mall audit that any services that Mall performed were not properly performed?
>
> **A.      In my role, no.**

(<u>Id.</u> at ¶167). GM's Regional Director testified that he has no knowledge as to how or why auditors LaKemper and Riley characterized certain deviations as "misrepresentations," acknowledged that alleged clerical deviations (such as handwritten mileage on job cards or improper service management authorizations) may have been characterized by the auditors as

34

"misrepresentations," and confirmed that in making the termination decision, he had no evidence of fraud and no evidence that warranty reimbursement claims were submitted to GM for vehicles not physically present at Mall. (Id. at ¶¶168-170). GM's Regional Director testified:

> Q.    Now, with regard to the audit at Mall Chevrolet, are you personally aware of any actual falsifications made to any work order?
> MR. MCGRATH: Objection. You can answer.
> **A.    No.**
>                                      ***
> Q.    And did anyone tell you or show you any documents that established that a car was not in New Jersey at the time a repair order was submitted?...
> **A.    No[.]**

(Id. at ¶170).

Additionally, expert Henson confirmed, within a reasonable degree of certainty, that "***none of the repairs identified by GM's auditors as falsification are, in fact, falsifications***." (Id. at ¶172) (emphasis added). Expert Henson further stated, "there is nothing in the documents reviewed by the GM auditors and myself to support GM's claim that Mall Chevrolet, Inc. submitted warranty claims for vehicles that were not present at the dealership." (Id.).

In sum, 53 of the 413 alleged deviations asserted against Mall are classified as "falsifications," despite the testimony of GM's auditors and every other GM deponent in this matter that GM found no conclusive evidence of fraud during the audit of Mall. Accordingly, GM's asserted chargebacks against Mall for alleged "falsifications" are unlawful under N.J.S.A. 56:10-15(f) and must be overturned.

## CONCLUSION

Under the NJFPA, no claim shall be charged back to a motor vehicle franchise unless it can be shown: (1) that the claim was false or fraudulent, (2) that the services were not properly

performed, (3) that the parts or services were unnecessary to correct the defective condition, or (4) that the motor vehicle franchisee failed to reasonably substantiate the claim in accordance with reasonable written requirements of the motor vehicle franchisor, provided that the motor vehicle franchisee had been notified of the requirements prior to the time the claim arose and the requirements were in effect at the time the claim arose. GM's $656,033.04 in purported chargebacks asserted against Mall are severely flawed and do not meet the strict criteria for lawful chargebacks against motor vehicle franchisees set forth in the NJFPA.

For these reasons, Mall respectfully submits that it is entitled to partial summary judgment as to Count V of its Complaint for GM's unlawful chargebacks asserted against Mall in violation of the NJFPA.

Respectfully submitted,

**BROWN & CONNERY, LLP**
*Attorneys for Plaintiff*

Dated:  March 11, 2020                    By:  s/ *Jonathan L. Triantos*
                                              William M. Tambussi, Esq.
                                              Jonathan L. Triantos, Esq.
                                              360 Haddon Avenue
                                              Westmont, New Jersey 08108
                                              Phone: (856) 854-8900
                                              Fax: (856) 858-4967
                                              Email: wtambussi@brownconnery.com
                                              Email: jtriantos@brownconnery.com

36