IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MALL CHEVROLET, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| GENERAL MOTORS LLC | : | NO. 18-15077-JRP-KMW |

## MEMORANDUM

**Padova, J.**                                                          **February 8, 2021**

Plaintiff Mall Chevrolet, Inc. ("Mall") commenced this action against Defendant General

Motors LLC ("GM") in October of 2018, after GM sent out notice that it was terminating Mall's

franchise agreement.   It asserts claims under the New Jersey Franchise Protection Act ("NJFPA"),

N.J. Stat. Ann. §§ 56:10-1 to 56:10-15, and common law.   Both Mall and GM have filed Motions

for Partial Summary Judgment, with Mall seeking judgment in its favor on Count I of the

Complaint,[1] and GM seeking judgment in its favor on Counts I, II, III, VI, and VII, as well as on

Mall's claim for punitive damage.   GM has also filed two additional Motions that raise issues

common to its summary judgment Motion:  a Motion to Strike Mall's Jury Demand and a Motion

*in Limine* to Preclude Evidence of Damages.   We held argument on these Motions on November

30, 2020, after which Mall filed a Motion to Supplement the Summary Judgment Record.   For the

following reasons, we now grant all three of GM's Motions and deny Mall's two Motions.   As a

result, we enter judgment in GM's favor on Counts I, II, III, VI, and VII of the Complaint, as well

as on Mall's claim for punitive damages, and we strike Mall's jury demand.   This case will go

forward on Mall's claim in Count V only.

---

[1] Mall previously moved for summary judgment in its favor as to Count V, and we denied that Motion in an Order dated September 3, 2020.

## I.    BACKGROUND

GM "manufactures and sells new Chevrolet motor vehicles . . . to independently owned and operated authorized dealers who, in turn, sell or lease vehicles to retail customers and perform repairs and service on those vehicles."  (Concise Statement of Stipulated Facts ("Stip. Facts."), ECF No. 75, ¶ 1.)  Mall has been an authorized dealer for Chevrolet vehicles since 1986.  (Id. ¶ 2.) At all times pertinent to this dispute, the contractual relationship between Mall and GM was governed by a Dealer Sales and Service Agreement, its addenda, and its Standard Provisions (collectively, the "Dealer Agreement"), which has an effective date of November 1, 2015.  (Id. ¶ 3; see also Dealer Agrmt., Stip. Facts Ex. A.)  Mall's Dealer Operator, Charles W. Foulke, III, who individually owned 15% of Mall's stock, signed the Dealer Agreement on behalf of Mall.  (Dealer Agrmt. at 2, 13 of 58.)  Mall agreed in the Dealer Agreement that Foulke would "provide personal services by exercising full managerial authority over Dealership Operations."  (Id., Art. 2; see also id. at 14 of 58.)

Under the Dealer Agreement, Mall agreed to promote and sell GM vehicles and to maximize customer satisfaction by providing quality service to those vehicles.  (Id., Arts. 5.1.1, 5.2.1.)  Mall also agreed to perform warranty repairs on GM vehicles and to timely submit true and accurate claims for payments.  (Id., Arts. 7.1.4, 11.2.)  GM agreed to reimburse Mall for warranty repairs in accordance with GM's Service Policies and Procedures Manual (the "Service Manual").   (Id., Art. 7.1.4.)

The Service Manual sets forth the processes for conducting warranty repairs and provides for a "job card system" to document and memorialize such repairs.  (Serv. Manual, Stip. Facts Ex. K, at § 3.)  Pursuant to the job card system, when a customer sought a repair, the service advisor would determine in the first instance if the vehicle qualified for warranty coverage.   (Lawrence

Van Pfeiffer Dep. Tr., Jeremy A. Cohen Decl. ("Cohen Decl.") Ex. 3, at 63-64, 71-72.)  The service advisor would then prepare a job card (sometimes called a "repair order") that included, inter alia, the vehicle identification number ("VIN"), the customer's name, the car's mileage, and the customer's concern or complaint.  (Id. at 74-75; Serv. Manual §§ 3.2.2-3.2.3.)  The job card was also to include the customer's authorization for the repair via a signature.  (Serv. Manual §§ 3.2.2, 3.2.4.)  If, however, a customer signature was not available, the service manager was permitted to write a reason for the missing signature and sign the job card himself.  (Id. § 3.2.4.)  After the job card was completed, the service advisor would then give the repair order to a dispatcher, who would assign the repair to a technician.  (Pfeiffer Dep. Tr. at 76, 79.)  The technician would perform a diagnostic procedure to confirm the root cause of the identified problem, record any diagnostic code on the repair ticket, and then make the repair.  (Id. at 79-81.)  The technician would then return the repair order to the service advisor, who would communicate with the customer, "document everything," and close the repair order.  (Id. at 88-89.)

"In May of 2017, GM conducted a regional review of warranty reimbursement claims which Mall had submitted to GM and which GM had paid."  (Stip. Facts ¶ 15.)  Following that review, in a May 16, 2017 letter, GM advised Mall that a "high number" of its warranty claims were "being processed for used vehicle locations, resulting in . . . questions as to the circumstances of these repairs and if they are compliant with the [policies and procedures in the Service Manual]."  (5/16/17 Ltr., Cohen Decl. Ex. 13.)  GM therefore stated that it would no longer compensate Mall for warranty repairs on vehicles from three used car retailers, i.e., CarMax Auto Superstores ("CarMax"), Carvana Company ("Carvana"), and DriveTime Automotive Group ("DriveTime") (collectively, the "Used Car Companies"), unless Mall received pre-authorization for those repairs from GM.  (Id.)

3

That same day (May 16, 2017), Ray Moffat, who was a service advisor who handled many of the repair orders from Carvana and DriveTime, told Mall's service manager, Walter Craig Colender, that he was quitting.  (Jane Ann Estes Dep. Tr., Cohen Decl. Ex 12, at 54; Leonard L. Yackimowicz Dep. Tr., Cohen Decl. Ex. 4, at 202-03; John Niessen Dep. Tr., Cohen Decl. Ex. 5 at 61; Walter Craig Colender Dep. Tr., Cohen Decl. Ex. 2, at 170-72.)  Moffatt sent a text message that evening to some of his co-workers—including Larry Pfeiffer, Mall's Service Manager, and Leonard Yackimowicz, a dispatcher—which stated:   "Craig knows everything, the truth, everything wasn't falling back on me and Craig.  I quit today.  Sorry guys good while it lasted." (5/16/17 Text Mssg., Cohen Del. Ex. 15.)

Three days later, on May 19, 2017, GM sent Mall a more detailed letter with the results of that month's regional review.  (Stip. Facts ¶ 16 and Ex. D.)  The letter advised Mall that GM had identified $114,178.60 of charges that had been submitted for reimbursement and that deviated from the standards for reimbursement set forth in GM's policies.  (5/19/17 Ltr., Stip. Facts Ex. D, at 1-2.)  The letter further advised Mall that a debit would be processed in that amount against Mall's account.  (Id. at 2)  Along with the letter, GM provided Mall with a detailed spreadsheet, listing the specific charges that had been submitted that GM had identified as deviating from its policies and providing explanations of the precise deviation that was identified with respect to each charge.  (5/19/17 Spreadsheet, Cohen Decl. Ex. 14.)   Among the deviations listed were:  the diagnostic codes provided could not have been generated by the make or model of the car, there was no customer signature and no reason stated for why it was missing, and there were different mileages reported in different places for the same car.  (See, e.g, id. at 4,  6, 11 of 45.)  The spreadsheet also indicated that, in one instance, CarMax had reported that the vehicle purportedly

repaired had been in Georgia and had not been brought to Mall's dealership in New Jersey to have work performed.  (Id. at 21 of 45.)

Between May 30, 2017 and June 13, 2017, Mall terminated technician Craig Nicholson, Service Manager Pfeiffer, and Dispatcher Yackimowicz.  (Stip. Facts ¶¶ 8, 10, 12 17-19.) Nicholson's termination report stated that he was terminated "Without Reservation" due to "Warranty Issues."   (Nicholson Term. Rpt., Stip. Facts. Ex. E.)   Both Pfeiffer's and Yackimowicz's termination reports stated that GM's warranty manager recommended that the employees be terminated following the GM service audit.  (Pfeiffer and Yackimowicz Termination Rpts., Stip. Facts Exs. F-G.)

In a July 5, 2017 letter, "GM advised Mall that it had been selected for an on-site audit 'to review the administration of [GM's] policies and procedures as provided in the [Dealer Agreement].'"  (Stip. Facts ¶ 20.)  The audit began on July 31, 2017.  (Id. ¶ 22.)  Two individuals, Gary LaKemper and Carl Riley, conducted the audit.  (Id. ¶ 23.)  The two reviewed the job cards that concerned warranty repairs between August 2, 2016 and July 14, 2017.  (Id. ¶ 24.)  The purpose of the review was to determine if there were deviations from the procedures required by the Service Manual, and the auditors ultimately prepared a 94-page Debit Deviation Report that identified 517 deviations on more than 400 job cards.  (Id. ¶¶ 25-26 and Ex. L.)

After LaKemper and Riley completed their on-site work, their findings were analyzed by GM's Dealer Audit Supervisor, Catherine Snyder.  (Id. ¶ 27.)  Snyder "analyzed their findings and reviewed vehicle repair history reports using a GM program known as Service Workbench[, which] contains information regarding the mileage and location of vehicles serviced by GM-authorized dealerships."  (Snyder Decl., Cohen Decl. Ex. 18, ¶ 5.)  Snyder "created a spreadsheet identifying at least 61 repair orders that the Auditors [had] reviewed . . . for which [she] gathered

additional evidence supporting the falsification of these warranty claim submissions."  (Id. ¶ 7.)
She found "numerous irregularities" that "further established that many vehicles were likely not
at Mall when it claimed to have repaired them."  (Id. ¶ 8.)

On May 3, 2018, GM issued Mall a Notice of Breach, which enclosed both the Debit
Deviation Report and an Audit Summary Report.  (Stip. Facts ¶¶ 28-29 and Ex. L.)  The Audit
Summary Report stated that, based on the audit, GM proposed a chargeback of $672,176.59 for
warranty claims that it deemed unsubstantiated.  (Debit Deviation Rpt., Stip. Facts Ex. L, at 5 of
99.)  Among the comments concerning many of the deviations reported was "Vehicle presence not
substantiated."  (See, e.g., id. at 23 of 99.)  The Notice of Breach stated that GM had "found
multiple submissions where the documentation either did not support the warranty claim or
actually reflected fraud."  (Id. at 3 of 99.)

GM highlighted four specific examples of deviations, and stated that these were just a "few
of the numerous false claims that GM uncovered," which were "blatant violations" of provisions
of Mall's Dealer Agreement, which, inter alia, required Mall to "submit true and accurate
applications or claims for payments" and prohibited "false application or reports."  (Id. at 2-3 of
99.)  Two of the four examples involved warranty repairs for the Used Car Companies.  (See id.
at 3 of 99.)  In one, for which Carvana was identified as the customer, GM noted that the job card
reflected mileage of 46,340, when the "Service Workbench" system reflected that the proper
mileage was 46,302 and another dealership in Georgia submitted a warranty repair for the same
vehicle four months later, reflecting a mileage of 46,316.  (Repair Docs. for Carvana Vehicle,
Cohen Decl. Ex. 20, at 4-5 of 17.)  In the other, for which CarMax was the customer, GM observed
that there was no mileage reported on the job card and the technician who supposedly completed
the work on February 9, 2017, did not reflect the same work on his time detail report and time

ticket for that date.  (Stip. Facts Ex. L, at 3 of 99; Repair Docs. for CarMax vehicle, Cohen Decl.

Ex. 21.)  In a third example, involving a customer by the name of Michael Grace, GM noted that

the mileage recorded for the vehicle on the job card had been scratched out and rewritten, and that

the rewritten mileage was lower than mileage that had been recorded for the very same vehicle

when it had been repaired by Mall on two prior occasions.  (Stip. Facts Ex. L, at 3 of 99; Repair

Docs. for Grace vehicle, Cohen Decl. Ex. 19.)

   GM further observed in its Notice of Breach that the Dealer Agreement gave it the power

to terminate the Agreement if it at any time learned that Mall had submitted false applications or

claims for payment.  (Stip. Facts Ex. L, at 4 of 99.)  GM advised Mall that it had 30 days to "submit

additional documentation, if any, to clear the deviations noted."  (Id. at 2 of 99; Stip. Facts ¶ 28.)

GM added that if Mall failed to respond or if its response did not "fully explain the circumstances

to GM's satisfaction, demonstrate that Mall's beaches have been corrected, and show that Mall

has established robust internal controls to prevent any recurrence . . . , then GM reserve[d] the right

to exercise its contractual and statutory rights to terminate Mall's Dealer Agreement."  (Stip. Facts

Ex. L, at 4 of 99.).

   On May 31, 2018, Mall responded to the Notice of Breach with two letters, one of which

enclosed almost 1000 pages of documents.  (Stip. Facts ¶ 30 and Exs. M & N.)  In one letter, Mall

specifically stated that it "did not deviate from GM's requirements" and that there was "no fraud

or false claims involved here and GM presents no evidence of fraud."  (5/31/2018 Ltr. Resp. to

Notice of Breach, Stip. Facts Ex. M, at 2-3 of 4.)  The letters themselves did not specifically

respond to the four examples of fraud set forth in GM's Notice of Breach.  (See id.; see also

5/31/2018 Ltr. Enclosing Docs., Stip. Facts Ex. N.)  Instead, Mall asserted that "it appears that the

auditors were intentionally claiming issues that do not exist" and offered up four specific examples

in which it contended that the deviations asserted were improper.  (Stip. Facts Ex. M, at 3 of 4.)

In the documents that Mall submitted in connection with one of the letters, Mall addressed the

asserted deviations with regard to the job card involving Michael Grace, but it did not address the

discrepancies between the mileage recorded on the job card and the lower mileages recorded at

prior service appointments, stating only that the "Correct mileage was entered by service writer at

time of write up," and that there was no prohibition on handwritten mileage in the Service Manual.

(Stip. Facts Ex. N, at Mall Chevrolet 0909.)  Mall informed GM that it had fired certain individuals

who were involved in the challenged claims, at GM's demand; had hired a new service manager,

two new service advisors and a new warranty administrator; had instituted regular training

sessions; and had adopted GM's Service Workbench approach to aid in its compliance with GM.'s

procedures.  (Stip. Facts Ex. M, at 3 of 4.)  At the same time, it accused GM of failing to deal with

Mall in good faith, and it stated it would meet any attempt to terminate the Dealer Agreement

"with the appropriate legal action."  (Id. at 3-4 of 4.)

On July 31, 2018, GM sent Mall a Notice of Termination.  (Stip. Facts ¶ 31 and Ex. O.)

In that Notice, GM again observed there were "extensive irregularities in Mall's claims for

warranty reimbursement," and stated that its "warranty audit team [had] analyzed the documents

[that Mall] sent" and found them "insufficient to clear the vast majority of the deviations."  (Notice

of Term., Stip. Facts Ex. O, at 2, 4 of 12.)  GM, in fact, stated that the supplemental submission

"cleared only 12 deviations for a total of $16,143.55, and did not "adequately address the four

specific instance of fraud that GM mentioned in its notice of breach."  (Id. at 4 of 12.)  Ultimately,

GM stated that "[d]ue to Mall's failure to substantially comply with GM's Service Policies and

Procedures Manual, Mall's submission of false applications and/or claims for payment concerning

warranty work . . . and Mall's deficient response to GM's notice of breach, GM hereby terminate[s] Mall's Dealer Agreement, . . . effective October 1, 2018." (Id. at 5 of 12.)

The instant lawsuit followed.  The Complaint currently contains six Counts.[2]  Count I asserts a claim for unlawful termination of Mall's franchise in violation of the NJPFA, N.J. Stat. Ann. § 56:10-5.  Count II asserts that GM imposed unreasonable standards of performance in violation of the NJFPA, N.J. Stat. Ann. § 56:10-7.4(a).  Count III asserts that GM utilized an unreasonable formula to gauge Mall's performance in violation of the NJFPA, N.J. Stat. Ann. § 56:10-7.4(d).   Count V asserts an NJFPA claim for unlawful chargebacks pursuant to N.J. Stat. Ann. § 56:10-15(f).  Counts VI and VII assert breach of contract claims, with Count VI asserting that GM breached the Dealer Agreement by refusing to reimburse Mall for fleet warranty services repairs, and Count VII asserting that GM breached the implied covenant of good faith and fair dealing by, inter alia, penalizing it for performing fleet warranty work, pressuring it not to perform such work, and subjecting it to unfair audits for performing such work.

During the course of this litigation, GM served discovery on the Used Car Companies. Carvana and CarMax provided GM with affidavits stating that Mall claimed to have repaired 78 of their vehicles in New Jersey on dates between August 23, 2016 and April 21, 2017, when those vehicles were located in different states.  (CarMax Aff., Cohen Decl. Ex. 22, ¶¶ 6-55 (identifying 49 vehicles that were not in NJ when purportedly repaired by Mall); Carvana Aff., Cohen Decl. Ex. 23, ¶¶ 6-13, 15, 17-21, 23-38 (identifying 29 vehicles that were not in NJ when purportedly repaired by Mall).)  DriveTime similarly provided GM with an affidavit stating that it had had no records of Mall repairing fourteen DriveTime vehicles that Mall claimed to have repaired between

---

[2] Mall voluntarily dismissed Count IV of the Complaint earlier in this litigation.

August 9, 2016 and May 3, 2017.  (DriveTime Aff., Cohen Decl. Ex. 24, ¶¶ 5-19.)  In particular, Carvana reported that it had no record of Mall ever repairing the Carvana vehicle to which GM had referred in its Notice of Breach and that its records reflected that the vehicle was in Georgia on the day it was purportedly repaired.  (Carvana Aff. ¶ 33.)   Similarly, CarMax reported that it had no record of Mall ever repairing the CarMax vehicle that GM had referred to in its Notice of Breach and that its records reflected that the vehicle was in transit between Winston-Salem, NC and Greensboro, NC on the day it was purportedly repaired in New Jersey.  (CarMax Aff. ¶ 31.)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.  In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment."  Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007).  If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002) (citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular

issue at trial, the movant's initial burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.  After the moving party has met that initial burden, the adverse party's response "must support the assertion [that there is evidence to support its case] by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322. "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).

"'When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact:  it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'"  United States v. $7,599,358.09, 953 F. Supp. 2d 549, 554 (D.N.J. 2013) (quoting In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003)).  In other words, the moving party has "'the burden of supporting [its] motion for summary judgment with credible evidence . . . that would entitle [it] to a directed verdict if not controverted at trial.'"  Foster v. Morris, 208 F. App'x 174, 179 (3d Cir. 2006) (quoting Bressman, 327 F.3d at 237 (3d Cir. 2003) (internal quotation marks omitted)).  Where "a moving party with the burden of proof makes [its required] affirmative showing, it is entitled to summary judgment unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." Bressman, 327 F.3d at 238 (citations omitted).

## II.     DISCUSSION

### A.  Count I

Both parties move for summary judgment in their favor on Count I of the Complaint, which asserts that GM issued its Notice of Termination without good cause, in violation of the NFJPA. For purposes of its Motion only, Mall concedes that warranty claims for vehicles not physically present at Mall were submitted to GM.  (N.T. 11/30/20, at 15.)  It nevertheless argues that GM can only prove good cause for termination if it proves that Foulke himself knowingly and intentionally breached the Dealer Agreement, and it maintains that GM has failed to establish such involvement by Foulke.  Secondarily, Mall argues that it is entitled to summary judgment in its favor because GM did not have conclusive evidence of fraud at the time that it issued the Notice of Termination. In its own Motion, GM argues that it is entitled to summary judgment in its favor on Count I because the undisputed evidence establishes that Mall materially breached the Dealer Agreement by submitting false warranty claims.

1.    The NJFPA's Requirement of Good Cause for Termination

The NJFPA prohibits a franchisor from "terminat[ing], cancel[ing] or fail[ing] to renew a franchise without good cause."  N.J. Stat. Ann. § 56:10-5.  "In any action . . . with respect to the termination of a motor vehicle franchise, the . . . franchisor shall have the burden of proving that termination of the motor vehicle franchise does not violate [N.J. Stat. Ann. § 56:10-5]."  N.J. Stat. Ann. § 56:10-30(c).  "In proving good cause for termination in any such action, the motor vehicle franchisor shall be limited to the grounds for termination set forth in the written notice [of termination]," id., which must "set[] forth all the reasons for such termination," id. § 56:10-5.

The NJFPA defines "good cause" as "the failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise."  Id.  According to the United States

Court of Appeals for the Third Circuit, there is "no real or practical difference between a conclusion that a party materially breached a contract, and a conclusion that the party failed to substantially comply with its obligations under a contract." <u>Gen. Motors Corp. v. New  A.C. Chevrolet, Inc.</u>, 263 F.3d 296, 317 n.8 (3d Cir. 2001).  Thus, "whether [a franchisee's] breach was material under the terms of the franchise agreement resolves the question whether [the franchisee] 'substantially comp[lied]' with the agreement for purposes of § 56-10-5's 'good cause' requirement." <u>Id.</u> (citing N.J. Stat. Ann. § 56:10-5).  Moreover, the "statutory definition of 'good cause' focuses solely <u>on the objective actions of the franchisee</u>—i.e. whether the franchisee substantially complied with franchise requirements—and not on the subjective motivations of the franchisor—i.e., whether the franchisor's decision was undertaken in bad faith."  <u>Id.</u> at 321 n.11 (emphasis added).

2.   Mall's Motion for Partial Summary Judgment as to Count I

a.   Is there a Requirement that the Franchisee Act Knowingly and Intentionally?

The above-stated law makes abundantly clear that, in order to determine whether a franchisor has good cause to terminate a franchise, a court need only determine if the franchisor has established that the franchisee materially breached the parties' franchise contract.  Mall nevertheless argues that a franchisor must establish that the franchisee knowingly and intentionally breached the franchise agreement.[3]  In support of this argument, Mall points to cases in which

---

[3] Mall has also argued that a franchisor cannot establish good cause if it did not act in good faith.  However, the Third Circuit has clearly foreclosed that argument.  <u>See</u> <u>New A.C.</u>, 263 F.3d at 321 n.11 ("Th[e] statutory definition of 'good cause' focuses solely on the objective actions of the franchisee . . . and not on the subjective motivations of the franchisor—i.e., whether the franchisor's decision was undertaken in bad faith."); <u>see also</u> <u>7-Eleven, Inc. v. Sodhi</u>, Civ. A. No 13-3715, 2016 WL 3085897, at *5 (D.N.J. May 31, 2016) ("[A]ny purported ulterior motive of [the franchisor], even if shown, is irrelevant to finding that [the franchisor] had good cause to

courts have stated that the NJFPA "is not designed to protect those franchisees who willfully violate the terms of their franchise agreements[,]" and does not "'prevent the severance of those who deliberately disregard [the] reasonable requirements contained in their contract with the franchise.'"  Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 495 A.2d 66, 72 (N.J. 1985) (citing Amerada Hess Corp. v. Quinn, 362 A.2d 1258, 1267 (N.J. Super. Ct. Law Div. 1976)); Kumon N. Am. Inc. v. Timban, Civ A. No. 13-4809, 2014 WL 2812122, at *5 (D.N.J. June 23, 2014) (quoting Amerada Hess, 362 A.2d at 1267, and citing Middletown Donut, 495 A.2d at 72).   However, the mere fact that courts have concluded that termination is statutorily permissible when franchisees have deliberately or willfully violated their franchise agreement does not mean that franchisees who violate their agreements unintentionally, or due to recklessness, negligence, or neglect, are not also subject to termination.  Indeed, as noted above, the statute states that, to establish good cause for termination, a franchisor need only show that the franchisee failed to "substantially comply" with the franchise agreement.  N.J. Stat. Ann. § 56:10-5.  Furthermore, the Third Circuit has equated this standard with that of material breach and has explicitly stated that the standard "focuses solely on the objective actions of the franchisee."  New A.C., 263 F.3d at 317 n.8; id. at 321 n.11 (emphasis added).  Accordingly, we reject Mall's assertion that a franchisor must establish that the franchisee deliberately or willfully breached its franchise agreement in order to establish good cause for termination.

### b.  Who is the Franchisee?

We also reject Mall's argument that we must consider Foulke, not Mall, to be the pertinent "franchisee" and that our analysis of whether GM has established good cause pursuant to the

---

terminate the Franchise Agreements." (citations omitted)).  Accordingly, we do not address this argument further.

statute must therefore focus on whether GM has pointed to evidence that Fouke himself knew about or was involved in any breach of the Dealer Agreement.  See N.J. Stat. Ann. § 56:10-5 (defining "good cause" for termination to be the "failure <u>by the franchisee</u> to substantially comply with those requirements imposed upon him by the franchise" (emphasis added)).  Mall argues that we should find that Foulke is the franchisee because the NJFPA defines franchisee as "a person to whom a franchise is offered or granted," N.J. Stat. Ann. § 56:10-3, and only Foulke is a "person." However, Mall neglects to acknowledge that the NJFPA explicitly defines "person" to mean either "a natural person" or a "corporation, partnership, trust, or other entity."  N.J. Stat. Ann. § 56:10-26.  Moreover, Mall's own Complaint alleges that Mall is the franchisee.  (See Compl. ¶ 7 ("Mall is a licensed New Jersey motor vehicle 'franchisee' as defined by N.J.S.A. 56:10-3(d) . . . ."); <u>id.</u> ¶ 130 ("Mall is a 'franchisee' and GM is a 'franchisor' under the Franchise Practices Act.  N.J.S.A. 56:10-3(c) and (d) . . . .").)  Indeed, Mall, not Foulke, is the named Plaintiff in this action, and the Complaint asserts NJFPA claims that the statute permits only a franchisee to assert.  N.J. Stat. Ann. § 56:10-10 ("Any franchisee may bring an action against its franchisor . . . .")  And, finally, the only parties to the Dealer Agreement—and, thus, the franchisee and franchisor—are Mall and GM, not Foulke and GM.  (See Dealer Agrmt. at 2 of 58; <u>id.</u> at Art. 2 ("Although this Agreement is entered into in reliance on the personal services of the Dealer Operator, the Dealer entity specified in this Agreement is the only party to this Agreement with General Motors.").)

Mall nevertheless argues that Foulke is the pertinent franchisee for our purposes because he signed the Dealer Agreement on behalf of Mall and was contractually required, as Mall's Dealer Operator, to provide personal services in connection with the Agreement.[4]  Mall cites to NJFPA

---

[4] Following oral argument on the pending Motions, Mall filed a Motion to Supplement the Summary Judgment Record, which seeks to supplement the record with, inter alia, evidence that the Dealer Agreement is a standard form agreement and to further argue that Foulke is the pertinent

cases in which courts have referred to the dealer operator or owner operator as the "franchisee," and it contends that we must therefore conclude that only Foulke's own individual breach of the franchise agreement can give rise to a lawful termination.  See, e.g., Simmons v. Gen. Motors Corp., Oldsmobile Div., 435 A.2d 1167, 1176-78 (N.J. Super. Ct. App. Div. 1981) (finding that owner operator, referred to as the "franchisee," had substantially breached franchise agreement by transferring his interest in the franchise to another individual without first notifying franchisor, where franchise agreement called for dealer operator's personal services and specifically "provided for termination of the agreement in the event of [the dealer operator's] withdrawal or resignation and in case of sale without GM's prior approval").[5]

---

franchisee for purposes of establishing good cause for termination.  Whether to grant leave to supplement the record is a matter within the court's discretion.  See Edwards v. Pa. Tpk. Comm'n, 80 F. App'x 261, 265 (3d Cir. 2003).  Here, the fact that the Dealer Agreement is a standard form agreement is irrelevant to our resolution of the issues presented on summary judgment, and Mall's additional arguments that Foulke is the pertinent franchisee add nothing to the already exhaustive briefing of this issue in connection with the pending Motions.  Accordingly, we deny Mall's Motion to Supplement insofar as it seeks to add these materials and arguments to the record.  Id. at 265 (affirming district court's denial of motion to supplement when "[t]he evidence [the movant] sought to introduce was merely corroborative of evidence already on the record and would not have altered the decision of the district court"); Saturn of Denville N.J., LP v. Gen. Motors Corp., Civ. A. No. 08-5734, 2009 WL 953012, at *3 (D.N.J. Apr. 7, 2009) (denying motion to supplement when "the information [the party] wishes to add to the record will not [a]ffect the Court's determination").

[5] Mall also cites to Tynan v. General Motors Corp., as a case that supports the proposition that the individual to whom a motor vehicle franchise is offered or granted is the franchisee.  591 A.2d 1024 (N.J. Super. Ct. App. Div. 1991), rev'd in part, 604 A.2d 99 (N.J. 1992).  However, at the start of the Tynan opinion, the court specifically identified the dealer itself, not its  owner, as the franchisee.  591 A.2d at 1025 ("Plaintiff Tynan was the 'sole owner' or the 'principal shareholder' of plaintiff Towne Chevrolet, a former General Motors (GM) franchise . . . ." (emphasis added)).  Moreover, the central question in Tynan was whether the prior owner of an automobile franchise, who had given up his franchise and then attempted to purchase another one, had standing to assert an NJFPA cause of action created in favor of  "franchisees" when the franchisor had rejected him as a prospective transferee.  Id. at 1027.  The court concluded that the New Jersey legislature "did not intend the Act to protect a prospective transferee and, thus, that a contract purchaser is not a 'franchisee' with standing to bring an action under the Act."  Id. at 1031.  Thus, we simply do not find Tynan to support Mall's position in this case.

We do not dispute that the Dealer Agreement in this case—and franchise agreements in other cases—impose duties on dealer operators; that dealer operators, acting on behalf of the franchisees, may breach such agreements by breaching those duties imposed upon them; and that, in such circumstances, a dealer operator's breach may provide a franchisor with good cause for termination. However, in the instant case, the primary duties that were allegedly breached were duties that the Dealer Agreement specifically placed on the Dealer, i.e., Mall. (Dealer Agrmt., Art. 11.2 (stating that "Dealer . . . agrees to timely submit true and accurate applications or claims for payments . . ."); id. Art. 13.1.10 (identifying Dealer's "Submission . . . of false applications or reports" as a breach of the Agreement); id. Art. 14.5.5 (stating that GM may terminate the Agreement if it learns that the Dealer has submitted "false applications or claims for any payment . . . where the false information was submitted to generate a payment to Dealer for a claim which would not otherwise have qualified for payment").) Accordingly, in considering whether there was good cause for termination, we do not consider whether Foulke individually breached his obligations under the Dealer Agreement but, rather, consider only whether Mall breached its obligations as the Dealer/franchisee. Accordingly, we reject all of Mall's arguments for judgment

---

Mall also contends that the court in Dunkin' Donuts of America, Inc. v. Middletown Donut Corporation, 495 A.2d 66 (N.J. 1985), considered the principal of a Dunkin' Donuts franchise, Gerald Smothergill, to be the franchisee for purposes of establishing good cause pursuant to the NJFPA's termination provision. But, in fact, the Middletown Donut court stated that:

> Defendant Gerald Smothergill owned all of the stock of defendant corporations, Middletown Donut Corporation and Shawn Donut Corporation. Each corporation had entered into franchise and lease agreements with Dunkin' Donuts, and Smothergill had personally guaranteed these agreements. Defendants are referred to in the singular as Smothergill or as franchisee.

495 A.2d at 68 (emphasis added). Accordingly, while this case used a shorthand "franchisee" to refer to both the franchisee and its individual owner, it does not support Mall's contention that only a dealer operator can be considered the franchisee for purposes of establishing good cause under the termination provision and we do not find it to require that we consider Foulke to be the franchisee in the instant case.

in its favor that are grounded on the premise that GM is required to establish that Foulke himself knowingly and intentionally breached the Dealer Agreement.

### c. Must the Franchisor Establish that it had Conclusive Evidence of Fraud at the Time of Termination?

We next turn to Mall's argument that it is entitled to summary judgment in its favor because GM did not have "conclusive evidence" of fraud in its possession at the time that it issued the Notice of Termination on July 31, 2018. Significantly, Mall's position that GM must establish that it had conclusive evidence of Mall's breaches on July 31, 2018, would necessarily prohibit GM from relying on any new evidence of the asserted breaches that it obtained in discovery—most notably, the evidence that GM obtained from the Used Car Companies.[6] However, there is simply no legal authority for Mall's assertion that GM must establish that it had conclusive evidence of fraud at the time that it issued the termination notice and that it may not defend against Mall's lawsuit for unlawful termination using additional evidence that it subsequently obtained. In maintaining that we must limit GM to the evidence that it had in July of 2018 and that GM must prove that it had good cause for termination based only on that evidence, Mall appears to rely exclusively on the NJFPA language that "[i]n proving good cause for termination . . . , the motor vehicle franchisor shall be limited to the grounds for termination set forth in the written notice [of termination]," N.J. Stat. Ann. § 56:10-30(c), which must "set[] forth all the reasons for such termination," id. § 56:10-5. But this statutory language, on its face, requires only that the

---

[6] Significantly, Mall previously filed a motion in limine seeking to exclude from evidence the affidavits that GM obtained from CarMax, Carvana, and DriveTime, and we denied that motion on September 24, 2020. (9/24/20 Order, ECF No. 117.) In doing so, we concluded, inter alia, that the affidavits concerned one of GM's stated reasons for terminating Mall's franchise, i.e., that Mall had submitted false warranty claims, and that the affidavits were "directly relevant to the disputed factual issue of whether . . . false warranty claims [for vehicles that were not physically present at Mall] were submitted and thereby provided good cause for termination." (Id. at 3 n.1.)

18

franchisor set forth in the notice of termination the reasons that it has concluded that the franchisee failed to substantially comply with the franchise requirements and then, if the franchisee subsequently challenges that termination, the franchisor must prove that the franchisee, in fact, failed to substantially comply with the franchise requirements as asserted in the notice.  The language in no way suggests that the franchisor must have and provide the franchisee with completely unassailable evidence of the franchisee's asserted breaches at the time that it issues the notice of termination.  And it in no way suggests that the franchisor, when sued by the franchisee, may not obtain in discovery—and use in its defense—additional  evidence of the same breaches that it set forth in the notice of termination.  Accordingly, we reject Mall's assertion that a franchisor attempting to prove good cause for termination must establish that it had conclusive evidence of fraud (or any other material breach) at the time that it issued the notice of termination. We therefore reject Mall's argument that summary judgment should be entered in its favor because GM did not have conclusive evidence of fraud on July 31, 2018.

Having concluded that all of Mall's arguments in support of summary judgment in its favor on Count I are grounded on misstatements of the law, we deny Mall's Motion for Partial Summary Judgment as to Count I in its entirety.

### 3.   GM's Cross-Motion for Partial Summary Judgment as to Count I

As noted above, the NJFPA places the burden on the franchisor to establish good cause for termination.  <u>See</u> N.J. Stat. Ann. § 56:10-30(c).  Accordingly, on GM's Cross-Motion for Summary Judgment as to Count I, it is GM's burden to point to undisputed evidence that Mall materially breached the Dealer Agreement.  <u>$7,599,358.09</u>, 953 F. Supp. 2d at 554 (stating that where the moving party bears the burden of proof on summary judgment, it must affirmatively establish that

there is no genuine dispute of material fact and that no reasonable jury could find in the non-moving party's favor (citing <u>Bressman</u>, 327 F.3d at 238)).

a.   GM's Evidence in Support of its Motion

GM asserts that the undisputed evidence establishes that it issued the Notice of Termination only after reasonably concluding that Mall had materially breached the Dealer Agreement by submitting false applications for payment and that "it did so only after Mall responded to the Notice of Breach with baseless denials, a complete lack of accountability, and accusations of bad faith against GM."[7]  (GM's Mem. in Opp. to Mall's Mot. for Partial Summ. J. and in Supp. of GM's Cross-Mot. for Partial Summ. J., ECF No. 82-1, at 29-30.)  To support its assertion that Mall submitted false claims, GM points to its Debit Deviation Report, which sets forth the discrepancies that its auditors identified in the paperwork that Mall submitted in connection with its claims for payment for warranty repairs.  (<u>See</u> Stip. Fact Ex. L.)  The discrepancies noted in the Report include missing customer signatures, lack of service manager approval, and incorrect or missing vehicle details.  (<u>See generally</u> <u>id.</u>)  For more than 170 work orders, the auditors recorded a comment that the vehicle's presence was "not substantiated."  (<u>Id.</u>)  In a summary of the report,

---

[7] Except to the extent that Mall argues that false submissions would not constitute a material breach unless Foulke knowingly participated in the breaches (an argument that we have rejected), Mall does not dispute that the submission of such claims, if proven, would constitute a material breach of the Dealer Agreement.  Furthermore, because the Agreement, on its face, prohibits the submission of false claims for payment, we conclude that the submission of numerous false claims for payment would, in fact, constitute a material breach.  (Dealer Agrmt., Art. 11.2 (stating that "Dealer . . . agrees to timely submit true and accurate applications or claims for payments . . ."); <u>id.</u> Art. 13.1.10 (identifying Dealer's "Submission . . . of false applications or reports" as a breach of the Agreement); <u>id.</u> Art. 14.5.5 (stating that GM may terminate the Agreement if it learns that the Dealer has submitted "false applications or claims for any payment . . . where the false information was submitted to generate a payment to Dealer for a claim which would not otherwise have qualified for payment").)

20

GM also classified 69 deviations, which accounted for $93,667.02 of the total proposed debit, as "misrepresentations."[8] (Id. at 5 of 99.)

GM also points to the Declaration of Catherine Snyder, the Dealer Audit Supervisor in GM's Audit Service Department. As noted above, Snyder states under oath in her Declaration that she analyzed the findings of the audit that were documented in the Debit Deviation Report, reviewed additional information from the Service Workbench program, registration records, and technician payroll and time records, and compiled a list of 61 repair orders that she believed were false due to "previous repairs done on vehicles in distant states, higher mileages during prior repairs, lack of time documentation for the technicians who supposedly repaired the vehicles, and voided vehicle identification numbers for vehicles Mall claimed to have repaired." (Snyder Decl., Cohen Decl. Ex. 18, ¶¶ 5-7.) She further attests that she concluded, based on the auditors' findings and the numerous irregularities that she also identified, "that many vehicles were likely not at Mall when it claims to have repaired them, thereby confirming that Mall had submitted false claims for payment to GM." (Id. ¶ 8.)

The undisputed evidence further reflects that, following this comprehensive audit, GM issued a Notice of Breach, in which it explicitly stated that it had identified warranty submissions that "actually reflected fraud," and it invited Mall to submit additional documentation or an explanation. (Stip. Facts Ex. L at 3-4 of 99.) GM additionally asserted in the Notice of Breach that Mall's actions were violations of provisions of the Dealer Agreement that required Mall to submit true and accurate claims for payment and prohibited the "submission of false application

---

[8] In the Debit Deviation Report, the items that GM classified as "misrepresentations" are identified with a Deviation Code of "9" in the Report's "Deviation Detail" column and include one of the following notations in the "Deviation Description" column: "Falsification Of Vehicle Details," "Falsification Of Work Order/Repair Order," "Falsification of Time Records," "Work Claimed Not Performed," or "Other Falsification." (See generally Stip. Facts Ex. L.)

or claims for . . . payment." (Id.)  As detailed above, by way of example, GM highlighted four specific instances of warranty submissions that it deemed false, including one involving Carvana, one involving Car Max, and one involving an individual named Michael Grace.  (Id. at 3 of 99; Cohen Decl. Ex. 19.)

Mall responded to the Notice of Breach with documentation, as well as assertions that there were no fraudulent or false claims and that GM had no evidence of fraud.  (Stip. Facts Ex. M, at 3 of 4.)  GM deemed Mall's response deficient, and it issued its Notice of Termination, stating that it was terminating the Dealer Agreement based on Mall's "failure to substantially comply with GM's Service Policies and Procedures Manual, Mall's submission of false applications and/or claims for payment concerning warranty work . . . and Mall's deficient response to GM's notice of breach." (Stip. Facts Ex. O, at 5 of 12.)  Then, in discovery in this case, GM obtained affidavits from CarMax, Carvana, and DriveTime, in which the Used Car Companies supported GM's assertions of false claims by confirming that they had no record of Mall repairing almost 100 vehicles for which Mall had made warranty claims and that almost 80 of those vehicles were not even in New Jersey when the warranty repairs were purportedly done.  (Cohen Decl., Exs. 22-24.) Also in discovery, GM asked Mall's Rule 30(b)(6) corporate designee, service manager Craig Colender, about the job card for customer Michael Grace, and Colender admitted that once he investigated that particular claim for payment, it was easy to determine that the claim was false. (Walter Craig Colender 30(b)(6) Dep. Tr., Cohen Decl. Ex. 6, at 212-13.)  Colender also conceded, in his individual capacity, that he believed that the mileage had been changed on that job card so that the repair charge would be covered under the vehicle's warranty.  (Colender Dep. Tr.,  Cohen Decl. Ex. 2, at 264-65.)

The above evidence is plainly sufficient to meet GM's burden on summary judgment to identify evidence "that would entitle [it] to a directed verdict if not controverted at trial." Foster, 208 F. App'x at 179 (quotation omitted).  Indeed, a reasonable jury could only conclude, based on the above evidence, that GM had good cause to terminate Mall's Dealer Agreement because GM reasonably concluded based on the hundreds of identified record-keeping discrepancies in Mall's warranty records that Mall had been submitting false claims for payment.  The burden therefore shifts to Mall to "come[] forward with probative evidence that would demonstrate the existence of a triable issue of fact."  Bressman, 327 F.3d at 238 (citations omitted).

### b.   Are there Triable Issues of Fact?

Mall argues there are genuine disputes of material fact as to whether GM had good cause to issue the Notice of Termination because there is evidence that certain deviations noted in the Debit Deviation Report were erroneous.  Specifically, Mall argues that there are genuine disputes of material fact as to the validity of the 69 deviations initially identified as "misrepresentations" in the summary of the Debit Deviation Report.[9]  It primarily reasons that the deviations were based on the auditors' assertions that there were improper service management authorizations for the

---

[9] Mall argues that sixteen of the 69 deviations deemed to demonstrate falsifications were duplicates and it therefore maintains that only 53 alleged deviations are actually at issue.  It is apparent from the Debit Deviation Report that there were often multiple repairs listed on a single job order and the Report lists each charged repair as a separate improperly substantiated claim for warranty payment.  (See, e.g., Stip. Facts Ex. L, at 17 of 99.)  Thus, when there are multiple entries in the Report for a single job card, those entries show that each payment claim on the job card is rejected for the same set of reasons.  (See, e.g., id.)  We therefore understand Mall's position that, when addressing the asserted deviations, it can address all charged repairs on a single job order together.  At the same time, we understand GM's position that, to the extent that a repair order may be fraudulent, each individual claim for payment on that repair order can be considered an independent fraudulent claim.  In the end, it appears that there is no dispute that there were 69 claims for warranty payments that were rejected as falsifications, and that those claims were associated with 53 job cards.

repairs and/or that the vehicle's mileage was handwritten, and it argues that there is evidence to support conclusions that the Mall service dispatchers who authorized the repairs were qualified to do so and that GM's Service Manual did not prohibit handwritten mileage. [10]

There are, in fact, complex and detailed factual questions as to whether certain record-keeping deficiencies that GM identified in the Debit Deviation Report were properly labeled as violations of GM's written requirements.  Indeed, in connection with a prior Motion that Mall filed for summary judgment on its unlawful chargebacks claim in Count V of the Complaint, we held that there was a "genuine dispute of material fact as to whether the service dispatcher approvals violated GM's written requirements and, thus, were valid deviations."  (9/3/20 Order, ECF No. 116, at 3 n.1.)  However, the mere fact that there may be factual disputes regarding whether certain record-keeping discrepancies constituted valid deviations from GM's requirements does not create a genuine issue of material fact as to whether GM reasonably concluded, based on the totality of the identified discrepancies, that Mall had been submitting false claims for warranty payment and that it therefore had good cause to terminate Mall's Dealer Agreement.  Indeed, the fact that discovery obtained from the Used Car Companies confirmed that Mall had submitted almost 100

---

[10] In Mall's Motion to Supplement the Summary Judgment Record, it asks to add to the record materials indicating that it attempted to mediate the propriety of the chargebacks that GM asserted in the Debit Deviation Report and that the mediation was stayed at GM's request.  It argues that this information is necessary to counter GM's statement at oral argument that Mall has "refused to repay any of [the chargebacks]" and is critical to resolution of the summary judgment motions because it demonstrates that "the veracity of the chargebacks has not been resolved." (N.T. 11/30/20, at 25; Mall's Mot. to Suppl. Summ. J. R. at 11.)  We do not find it to be relevant to the instant dispute whether it was Mall or GM that made the decision to stay mediation of the chargebacks.  Moreover, the existing summary judgment record already adequately reflects that the veracity of each and every chargeback has not yet been tested and resolved.  Consequently, we deny Mall's Motion to Supplement the Summary Judgment Record with these additional materials, which would have no effect on our resolution of the issues before us.  See Edwards, 80 F. App'x at 265.  Furthermore, in light of our prior resolution of the remainder of the Motion to Supplement, see supra note 4, we deny that Motion in its entirety.

warranty payment claims for vehicles that the Used Car Companies had no record of Mall repairing, and that nearly 80 of those vehicles were not even located in New Jersey when they were purportedly repaired, makes clear that GM's conclusion, based on its audit, that Mall was submitting false warranty claims was not only reasonable, but was also correct.  Thus, in spite of there being factual disputes regarding certain specific deviations and record-keeping discrepancies, we conclude that those questions of fact are not material to the question of whether GM had good cause because they do not provide a basis on which to find that GM's ultimate conclusion from the audit that Mall was submitting false claims in breach of the Dealer Agreement was unjustified.

At oral argument on the summary judgment Motions, we specifically asked Mall to identify any facts in the record that could give rise to a genuine dispute as to the location of the nearly 100 cars identified in the Used Car Companies' affidavits, i.e., whether it could point to any evidence that those cars were actually located at Mall on the dates of their claimed repairs.[11]  In response to that inquiry, Mall asserted that Ray Moffatt, a service advisor at Mall, testified at his deposition

---

[11] Mall has suggested that the affidavits from CarMax, Carvana, and DriveTime have little probative value because they were "generated, edited, and re-edited by GM" and contain "substantial inaccuracies and inconsistencies." (Mall's Mem. in Opp. to GM's Mot. for Partial Summ. J., ECF No. 98, at 17.) However, it does not develop this assertion in its summary judgment papers and it ultimately argues that GM cannot establish good cause with the affidavits "putting aside [their] inaccuracies and inconsistencies." (Id.)  Accordingly, we do not read Mall's summary judgment arguments to rest on a challenge to the credibility of the Used Car Company affidavits. Moreover, it bears noting that "[a] plaintiff cannot survive summary judgment simply by asserting the jury might disbelieve the testimony of defendant's witnesses." Layden v. Target Corp., Civ. A. No. 15-3467, 2018 WL 3122334, at *9 (D.N.J. June 25, 2018) (citing Schoonejongen v. Curtiss Wright, 143 F.3d 120, 130 (3d Cir. 1998)) (additional citations omitted).  Rather, a party must produce affirmative evidence to defeat a properly supported summary judgment motion.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("[A]n opponent [to a summary judgment motion] may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence." (citing Anderson, 477 U.S. at 256-57)).  Accordingly, we will consider only whether Mall has produced affirmative evidence that creates a genuine dispute of material fact as to the matters contained in the affidavit.

that if he generated a repair order, he "would have had keys to th[e] vehicle." (N.T. 11/30/20, at 38-39 (quoting Moffett Dep. Tr., Cohen Decl. Ex. 25, at 87).) Mall further noted that, with respect to one specific vehicle that, according to Carvana, was in Texas when Mall purportedly repaired it, Moffett testified that he "assume[d]" but did not "have definitive proof" that that vehicle was at Mall, and that "if [he] wrote it up and had keys, then . . . [he] did do the work." (N.T. 11/30/20, at 38-39; Moffett Dep. Tr. at 124-25.) Mall also pointed to deposition testimony from the representative of DriveTime who testified that it would be speculation to state where its vehicles were at the time that they were purportedly repaired and, thus, only stated in his affidavit that DriveTime had no record of Mall repairing its vehicles on the dates that they were purportedly repaired.[12] (N.T. 11/30/20, at 39; DriveTime Aff., Cohen Decl. Ex. 24, ¶¶ 5-19.) Finally, Mall pointed to the deposition of Mall dispatcher Yackimowicz, who testified at his deposition that he had a specific recollection of working on one car that CarMax stated was in Denver, Colorado on the day that Mall's records reflect that the repair was conducted and thus, he believed that CarMax's statement that the car was in Denver was false. (See N.T. 11/30/20, at 39; Yackimowicz Dep. Tr., Cohen Decl. Ex. 4, at 286-89.) Nonetheless, even construing the facts in the light most favorable to Mall, we find that these few scattered and inconclusive facts are simply insufficient

---

[12] The DriveTime representative's deposition transcript is not in the summary judgment record. However, Mall attached the transcript of that deposition as exhibit 20 to its "Motion *in Limine* to Bar Documents and Information obtained by GM from Third-Party Entities after the Notice of Termination," which is Docket No. 74 in this case. That deposition transcript reflects that the DriveTime representative did, in fact, testify that DriveTime took the position that it could only speculate as to the location of the DriveTime vehicles at issue on the dates that Mall purportedly repaired them. (Diana Chavez Dep. Tr., ECF No. 74-16, at 112, 125-26.) However, the DriveTime representative made clear in her affidavit that DriveTime creates and maintains records of repairs that third-parties perform on its vehicles. (DriveTime Aff. ¶ 3.) Thus, although her affidavit does not attest to the location of the DriveTime vehicles at issue in this case, it states that DriveTime's records do not reflect that Mall performed repairs on fourteen vehicles on the dates that Mall claimed to have repaired them. (Id. ¶¶ 6-19.) Mall has not offered any evidence that disputes DriveTime's representations in this regard.

to create a genuine issue of material fact as to whether the nearly 100 Used Car Company cars at issue were physically present at Mall on the dates that they were purportedly repaired.  See Galli, 490 F.3d at 270 (requiring non-moving party's evidence on summary judgment to be "more than a scintilla." (quotation omitted)).  At best, these facts might support a reasonable jury conclusion that just one of the nearly 100 cars—the one that Yackimowicz specifically remembered—was at Mall for its claimed repair.  Accordingly, we conclude that Mall has failed to point to evidence that creates a genuine issue of material fact as to the location of the nearly 100 cars addressed in the Used Car Company affidavits for which warranty claims were submitted.

In sum, we conclude that a reasonable jury could only conclude based on the record evidence that Mall submitted upwards of 100 false warranty claims for vehicles that were not present at its facility.  Moreover, the submission of such false warranty claims, which was a ground for termination set forth in the Notice of Termination, constituted a material breach of the Dealer Agreement and thus, provided GM with good cause to terminate the Dealer Agreement.  We therefore grant GM's Cross-Motion for Partial Summary Judgment insofar as it seeks judgment in its favor on Count I of the Complaint, and we enter judgment on that Count in GM's favor.

## B.  Counts II, III, VI, and VII

In Counts II, III, VI and VII of the Complaint, Mall asserts NJFPA claims for unreasonable performance standards and unreasonable formulas for gauging franchise performance, in violation of N.J. Stat. Ann. § 56:10-7(a) and (d); a breach of contract claim; and a claim for breach of the covenant of good faith and fair dealing.  Mall's claims in these Counts are all grounded on allegations that GM improperly penalized Mall for performing fleet warranty work for government entities, including police departments, because such work produced high warranty costs for GM. Mall maintains that, because it did this work, GM subjected it to unfair audits designed to coerce

and intimidate Mall to abandon its contractual and statutory rights to perform the work.  In all four

claims, Mall seeks to recover "all of [Mall's] damages from GM, including, but not limited to,

attorneys' fees and costs of suit," as well as punitive damages.  (Compl. ¶¶ 141, 147, 165, 169,

and Prayer for Relief ¶ 8.)

     GM has moved for summary judgment on these four claims (Counts II, III, VI and VII),

arguing that all four claims require proof of recoverable damages and that Mall has offered no

proof of damages.  After receiving GM's motion for summary judgment on these claims, Mall for

the first time produced an affidavit from Foulke, which sets forth over $900,000 in purported

damages arising from the four claims asserted in Counts II, III, VI and VII.  Mall maintains that

the Foulke affidavit satisfies any obligation it has to produce proof of damages.  It also argues that

it can proceed with its claims to seek punitive damages on its NJFPA claims in Counts II and III,

even in the absence of proof of compensatory damages.[13]

---

[13] Mall does not dispute that it cannot proceed on its contract claims in Count VI and VII
in the absence of proof of compensatory damages.  (See Mall's Mem. in Opp. to GM's Cross-Mot.
for Partial Summ. J., ECF No. 98, at 34 (citing Sheet Metal Workers Int'l Ass'n Local No. 27 v.
E.P. Donnelly, Inc., 737 F.3d 879, 900 (3d Cir. 2013) (requiring proof of damages for breach of
contract claim under NJ law), and Wade v. Keller Inst., 778 A.2d 580, 586 (N.J. Super. Ct. App.
Div. 2001) (requiring proof of damages for breach of implied covenant of good faith and fair
dealing claim under NJ law)).)  Similarly, there is no dispute that punitive damages are not
available on the breach of contract claims.  See Thomas v. Ne. Univ., 457 F. App'x 83, 85 (3d Cir.
2012) ("[P]unitive damages . . . are not recoverable under New Jersey law for breach of contract."
(citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1194 (3d Cir. 1993))); see also Lewis v.
Gov't Employees Ins. Co., Civ. A. No. 18-5111, 2019 WL 1198910, at *5 (D.N.J. Mar. 14, 2019)
("The New Jersey Supreme Court has held that generally 'punitive damages are not available in
an action for a breach of contract.'" (quoting Buckley v. Trenton Saving Fund Soc'y, 544 A.2d
857, 865 (N.J. 1988))).
     On the other hand, it argues in its papers that it can proceed on its NJFPA claims in Count
II and III without proving that it is entitled to damages.  In support of this position, it cites Dunkin'
Donuts Inc. v. Dough Boy Management, Inc., Civ. A. No. 02-243, 2006 WL 20521 (D.N.J. Jan 3,
2006), for the proposition that "the NJFPA does not explicitly require a showing of damages in
order to establish a violation."  Id. at *11.  However, the NJFPA, by its terms, only permits a
franchisee to bring an action for either damages or injunctive relief.  N.J. Stat. Ann. § 56:10-10
(stating that "[a]ny franchisee may bring an action against its franchisor for violation of this act . .

GM argues in both its reply brief in support of its summary judgment motion, and in a later-filed Motion *in Limine* to Preclude Evidence of Damages, that Mall cannot rely on the Foulke affidavit to prove damages because, inter alia, Mall failed to disclose the affidavit in a timely fashion under Federal Rule of Civil Procedure 26 and the affidavit does not contain the specificity that Rule 26 disclosures require.[14]  Rule 26(a) requires parties to voluntarily disclose:

> a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

Fed. R. Civ. P. 26(a)(1)(A)(iii).  Rule 26(e) further obligates parties to supplement any disclosures they have made:

> [a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

---

. to recover damages . . . and, where appropriate, . . . injunctive relief.")  Here, Mall does not seek injunctive relief on its claims in Count II and Count III.  Thus, it must establish some recoverable damages in order to prevail on those claims.  GM maintains that Mall must prove a right to compensatory damages because there is no right to punitive damages under the NJFPA but, for purposes of this Motion, we will assume without deciding that Mall may support its claims in Counts II and II by establishing a viable claim for either compensatory or punitive damages.  However, in order to survive summary judgment on those claims, Mall must point to proof of either one or the other.  Indeed,  we asked Mall's counsel at oral argument, "If we hold that [Mall is] not entitled to damages, compensatory or punitive, what's left other than that with Counts 2 and 3?," and counsel replied, "There is nothing left."  (N.T. 11/30/20, at 71.)

[14] GM also argues that we should disregard the Foulke affidavit as a sham affidavit, and/or because it is factually insufficient to support any claim for damages.  Because we conclude that Mall cannot rely on the affidavit because it was not timely disclosed under the Federal Rules and does not have the contents that the Federal Rules require, we need not resolve these alternative arguments for excluding the Foulke affidavit from evidence.

Fed. R. Civ. P. 26(e).  At the same time, Rule 37 addresses a party's "Failure to Make Disclosures

or to Cooperate in Discovery."  Fed. R. Civ. P. 37.  It states in pertinent part:

> If a party fails to provide information . . . as required by Rule 26(a)
> or (e), the party is not allowed to use that information or witness to
> supply evidence on a motion, at a hearing, or at a trial, unless the
> failure was substantially justified or is harmless.  In addition to or
> instead of this sanction, the court, on motion and after giving an
> opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including
> attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions . . . .

Fed. R. Civ. P. 37(c)(1).  "Rule 37 is 'written in mandatory terms and is designed to provide a

strong inducement for disclosure of Rule 26(a) material.'"  Horizon Blue Cross Blue Shield of

New Jersey v. Transitions Recovery Program, Civ. A. No. 10-3197, 2015 WL 1137777, at *3

(D.N.J. Mar. 13, 2015) (quoting Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir.

1995)).  "However, district courts must 'exercise particular restraint in considering motions to

exclude evidence.'"  Id.  (quoting ABB Air Preheater v. Regenerative Envtl. Equip. Co., 167

F.R.D. 668, 671 (D.N.J. 1996) (additional citations omitted)); Meyers v. Pennypack Woods Home

Ownership Ass'n, 559 F.2d 894, 905 (3d Cir. 1977).  The Third Circuit has stated that "'the

exclusion of critical evidence is an "extreme" sanction, not normally to be imposed absent a

showing of willful deception or "flagrant disregard" of a court order by the proponent of the

evidence.'"  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791–92 (3d Cir. 1994) (quoting Meyers,

559 F.2d at 905).

    In determining whether to exclude evidence pursuant to Rule 37(c)(1), we are to "consider

four factors: (1) the prejudice or surprise of the party against whom the excluded evidence would

have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case . . . ; and (4) bad faith or wilfulness in failing to comply with a court order or discovery obligation." Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 148 (3d Cir. 2000) (citing Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997); see also Horizon Blue Cross Blue Shield of New Jersey, 2015 WL 1137777, at *3 (citing Newman, 60 F.3d at 156). A fifth factor for consideration is "the importance of the excluded evidence." Accurso v. Infra-Red Servs., Inc., 169 F. Supp. 3d 612, 616 (E.D. Pa. 2016) (citing ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 298 (3d Cir. 2012)). "The burden . . . falls on the moving party to establish that exclusion is the most appropriate remedy." Accurso, 169 F. Supp. 3d at 615 (citations omitted).

Here, Mall made its original Rule 26 disclosures on December 12, 2018. It stated in its initial disclosure under the heading "Calculation of Damages" that it was seeking damages on its breach of contract and NJFPA claims, but that it "ha[d] not yet computed the full amount of damage it ha[d] sustained." (Mall's Initial Disclosures, Mall's Mem. in Opposition to GM's Mot. *in Limine* to Preclude Evid. of Damages Ex. A, ECF No. 138-2, at 14 of 15 ¶ C.) It supplemented those disclosures on November 8 and November 14, 2019. In the November 14, 2019 Amended Rule 26 disclosures, Mall again stated, under the heading "Calculation of Damages," that it was seeking "damages for GM's breaches of the Dealer Agreement and violations of the [NJFPA] and common law, as well as attorneys' fees and costs." (Mall's 2d Am. Disclosures, Cohen Decl. Ex. 28, at 16 of 17 ¶ C.) This time, it did not add that it had not yet computed its damages, but it also did not include a computation of damages. (See id.) Fact discovery ended on January 22, 2020. Expert disclosures were due on February 23, 2020, and Mall did not disclose a damages expert. On March 23, 2020, GM filed its Motion for Partial Summary Judgment as well as a Motion to

Strike Mall's Jury Demand, both of which argued that Mall had failed to produce any evidence of damages.  Mall attached the Foulke affidavit, which is dated April 6, 2020, as an exhibit to both its April 6, 2020 response to GM's jury demand motion and its April 20, 2020 response to GM's Motion for Partial Summary Judgment.  (See Foulke Aff., Mall's Mem. in Opposition to GM's Cross-Mot. for Partial Summ. J. Ex. F, ECF No. 98-7.)

The affidavit consists of 18 paragraphs.  (Id.)  Foulke states in the affidavit that from July 2017 to October 2017, GM auditors performing Mall's on-site audit caused Mall to suffer $729,337 in lost profits by disrupting Mall's business by talking to employees, requesting records, reviewing warranty claims, requiring employees and managers to scan copies of Mall's records and review records, and preventing General Manager Colender from performing his management responsibilities (including meetings with customers and employees).  (Id. ¶¶ 2-11.)  He further states that, from May 2018 to July 2018, GM caused Mall to suffer $263,784 in lost profits by forcing Foulke and Colender to spend hundreds of hours reviewing and collecting documents in connection with litigation and appearing at depositions, and causing declining job performance from Mall employees who feared losing their jobs.  (Id. ¶¶ 12-16.)  Foulke supports these specific figures by stating that (1) Mall's profits between July 2017 and October 2017 were $729,337 lower than the profits earned in 2016 (id. ¶ 11), and (2) that Mall's profits had been growing each year by more than 20% from 2012 through 2017, that they began to drop in 2017, and that, in 2018 and 2019, it "lost profits of $263,784.00 as a result of the GM's chargebacks, termination, and this litigation."  (Id. ¶¶ 15-16.)  The affidavit does not acknowledge or account for the possibility that there may have been alternative causes for Mall's decreased profits during the specified time frames.  (See generally id.)

GM asks that, as a sanction for Mall's failure to timely provide the information required in Rule 26(a) and (e), we preclude Mall from "us[ing] that information . . . to supply evidence on a motion . . . or . . . a trial," arguing that Mall's failure was neither "substantially justified [nor] harmless." Fed. R. Civ. P. 37(c)(1). In assessing this argument, we look to the five factors set forth above. First, it is plain that GM was both surprised and prejudiced by Mall's failure to disclose before April 2020 that it was seeking lost profit damages and/or damages for "investigatory costs." Indeed, there is no evidence in the record that Mall had communicated in any way that it was seeking such damages and, as a result, GM did not question any of Mall's witness about such damages at their depositions and did not retain a damages expert.[15] Moreover, GM prepared and filed both its Motion for Partial Summary Judgment and its Motion to Strike Mall's Jury Demand based on its justifiable understanding that Mall had no evidence of damages. At today's late date, there is no conceivable way to cure the prejudice that GM has suffered by Mall's late damages disclosure without completely upending this long-standing litigation, which is now nearing trial. Among other potentially curative measures, we would have to reopen both fact and expert discovery to permit GM to respond to this new evidence and damages theory and would then have to permit GM to file new dispositive motions and motions in limine. See Allstate Life Ins. Co. v. Stillwell, Civ. A. No. 15-8251, 2020 WL 832898, at *6 (D.N.J. Feb. 20, 2020) ("Defendants should have been able to explore in detail . . . [and] to conduct significant discovery on the theory that they should be responsible for $250,000 in damages. . . [, and they] were denied the appropriate opportunity to do so because of [plaintiff's] . . . failure to comply with its discovery obligations and its obligations under Rule 26(a).") Thus, if we were to permit the affidavit to be introduced into evidence and permit Mall to rely on these belatedly-claimed damages, disruption

---

[15] GM stated at oral argument that it took 11 or 12 depositions. (N.T. 11/30/20, at 49.)

33

of this litigation and the upcoming trial would not merely be likely, but would be certain.  See, e.g., id. at *7 ("It would certainly be disruptive to the just resolution of this matter to permit [plaintiff] to rely on information supporting its damages claims that Defendants did not have access to before fact discovery closed.")

        We also have little trouble concluding that Mall's belated disclosure of the significant damages claims set forth in the Foulke affidavit demonstrates both bad faith and an unwillingness to comply with the well-known requirements of Rule 26.  Indeed, it seems indefensible that Mall did not produce the affidavit at some point during fact discovery, particularly when the affidavit is from Mall's own principal.[16]  And while we also consider the importance of the evidence and recognize that evidence of damages is critically important to the success of Mall's claims, such considerations cannot outweigh Mall's blatant disregard for its obligations under Rule 26 and the transparent impropriety of its post-discovery attempt to cure its proof deficiencies using a hastily-prepared affidavit from its own principal.  It also bears noting that we seriously question the probative value of the affidavit presented, which includes no computation of damages, does not cite to specific documents that support it, and does little to attempt to establish the necessary causal connection between GM's alleged penalization of Mall for performing fleet warranty work and the damages asserted.  See Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring the disclosing party to provide "a computation of each category of damages claimed" and to "make available for inspection and copying . . . documents or other evidentiary material . . . on which each computation is based");

---

[16] Mall argues that it adequately informed GM of its lost profits claim because it produced in discovery its 2015-2018 financial statements, which reflect the decrease in profits that Foulke references in his affidavit.  However, the production of these financial statements, without any accompanying computation of claimed damages, does not comply with Rule 26, particularly when Mall only informed GM in its Complaint that it was seeking "all of its damages" and it identifies no point in time that it advised GM that it was seeking "lost profits" and "investigatory costs" prior to its production of the Foulke Affidavit.  (Compl. ¶¶ 141, 147, 161, 165, 169.)

Cromartie v. Carteret Sav. & Loan, 649 A.2d 76, 83 (N.J. Super. Ct. App. Div. 1994) ("To recover lost profits, a party must show that profits were lost as a result of the actionable conduct complained of."). For all of these reasons, we grant GM's motion to exclude any evidence of damages referenced in or based upon the Foulke affidavit, concluding that the failure to produce the affidavit prior to the filing of dispositive motions was neither "substantially justified [nor] harmless," that Mall's actions flagrantly disregarded its Rule 26 obligtions, and that exclusion of the affidavit from evidence is the only appropriate sanction. Fed. R. Civ. P. 37(c)(1).

In the absence of the evidence set forth in the Foulke affidavit, Mall has put forth no evidence of compensatory damages that it has sustained as a result of Mall's alleged misconduct in Count II, III, VI, and VII of the Complaint. Without such damages, it cannot proceed on its breach of contract claims in Count VI and VII and judgment must be entered in GM's favor on those claims. See supra note 13. Mall argues that it should nevertheless be permitted to pursue its NJFPA claims in Count II and III in order to collect punitive damages. However, the New Jersey Punitive Damages Act precludes an award of punitive damages absent an award of compensatory damages. N.J. Stat. Ann. § 2A:15-5.13 (stating that "[p]unitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial"); Smith v. Whitaker, 734 A.2d 243, 253 (N.J. 1999) (observing that the New Jersey Punitive Damages Act provides that "an award of compensatory damages [is] a statutory predicate for an award of punitive damages" (citing N.J.S.A. 2A:15–5.13(c)). Accordingly, we conclude that Mall cannot proceed on a claim for punitive damages on the NJFPA claims because it is unable to establish that it is entitled to any compensatory damages. Moreover, with no recoverable compensatory or punitive damages, Mall cannot prevail on its NJFPA claims in Count II and III. See supra note 13.

In sum, we conclude that Mall has failed to produce any evidence of damages that could support its claims in Counts II, III, VI, and VII.  We therefore grant GM's Motion for Summary Judgment insofar as it seeks judgment in its favor on Counts II, III, VI, and VII of the Complaint.

### C.  Punitive Damages

GM's Motion for Partial Summary Judgment also asks that we enter judgment in its favor on all claims for punitive damages in Mall's Complaint.  (See Compl. Prayer for Relief ¶ 8 (requesting punitive damages with respect to all Counts of the Complaint).  We have already concluded that judgment should be entered in GM's favor on Counts I, II, III, VI, and VII and thus, the only claim for punitive damages that remains is that in connection with Count V, which asserts an NJFPA claim for unlawful chargebacks.

The claim for unlawful chargebacks arises out of GM's attempt to obtain reimbursement for the more than $650,0000 in payments that it made to Mall for warranty repairs that GM subsequently identified in its Debit Deviation Report as based on either false or unsubstantiated claims.  Count V asserts that these chargebacks violated NJFPA § 56:10-15(f), which prohibits a franchisor from charging back to a franchisee a warranty claim that has been approved and paid unless the franchisor can show that (1) "the claim was false or fraudulent," (2) "the services were not properly performed," (3) "the parts or services were unnecessary to correct the defective condition," or (4) the "franchisee failed to reasonably substantiate the claim in accordance with reasonable written requirements of the . . . franchisor" "provided that . . . the franchisee had been notified of the requirements prior to the time the claim arose and the requirements were in effect at the time the claim arose."  N.J. Stat. Ann. § 56:10-15(f).  As remedies, Count V seeks "an Order declaring that GM's asserted chargebacks are in violation of N.J.S.A. 56:10-15(f), an Order enjoining GM from unlawfully charging back Mall, and recovery of all of its damages from GM,

including, but not limited to attorneys' fees and costs of suit pursuant to N.J.S.A. 56:10-29," and punitive damages.  (Compl. ¶ 161, Prayer for Relief ¶ 8.)

The record reflects that GM ultimately requested that Mall reimburse it $656,033.04 in payments it made on warranty claims that it deemed false or unsubstantiated and there is no record evidence reflecting that Mall ever repaid those claims.  (See Stip. Facts Ex. 0, at 4, 6 of 12.)  Mall, in fact, appears to concede that it has not paid the $656,033.04 in proposed chargebacks because those chargebacks have been stayed until the conclusion of this litigation.  (See N.T. 11/30/20, at 67; Mall's Mem. in Opp. to GM's Jury Demand Mot., ECF No. 94, at 10.)  Moreover, Mall has not set forth any other admissible evidence of other damages that it has a sustained as a result of allegedly unlawful chargebacks in Count V.[17]  Accordingly, just as with Mall's claims in Count II, III, VI, and VII, Mall has no evidence of damages that it has sustained as a result of GM's conduct at issue in Count V, and, in the absence of proof of compensatory damages, the New Jersey Punitive Damages Act prohibits it from collecting punitive damages in connection with that claim.  N.J. Stat. Ann. § 2A:15-5.13(c).  We therefore grant GM's summary judgment motion insofar as it seeks judgment in GM's favor on Mall's claim for punitive damages in its entirety.

### D.  Right to Jury Trial

GM has also filed a Motion to Strike Mall's Jury Demand, arguing that, because Mall has not asserted a viable claim for damages, the only relief it can seek is equitable in nature.  As we have granted judgment in GM's favor on all claims except Count V, this is the only claim we must now consider.  In addition, because we have concluded that Mall is not entitled to either

---

[17] Although the Foulke Affidavit states that Mall suffered "lost profits in the amount of $263,784.00 as a result of GM's chargebacks, termination, and this litigation," we have already ruled that this affidavit is inadmissible and cannot provide a basis for any damages claim.  (Foulke Aff. ¶ 16.)

compensatory or punitive damages in connection with that claim, the only relief that Mall can obtain at trial is "an Order declaring that GM's asserted chargebacks are in violation of N.J.S.A 56:10-15(f), an Order enjoining GM from unlawfully charging back Mall, and . . . attorneys' fees and costs of suit pursuant to N.J.S.A. 56:10-29." (Compl. ¶ 161.)

"The right to a jury trial in the federal courts is . . . determined as a matter of federal law." Simler v. Conner, 372 U.S. 221, 222 (1963). Federal Rule of Civil Procedure 38(a) provides that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate." Fed. R. Civ. P. 38(a). Under the Seventh Amendment, "[c]ourts have consistently held that suits merely seeking injunctive relief, not monetary damages, are equitable in nature and do not provide a right to jury trial." Syncsort Inc. v. Innovative Routine Int'l, Inc., Civ. A. No. 04-3623, 2008 WL 11381901, at *7 (D.N.J. July 30, 2008) (citations omitted).  As a corollary to this principle, "[w]hen faced with a situation in which a party cannot tender evidence essential to its only legal claim, a federal trial court may strike a jury demand without offending the Seventh Amendment."  AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 222 (3d Cir. 2009) (citations omitted); see also Koninklijke Philips N.V. v. Hunt Control Sys., Inc., Civ. A. No. 11-3684, 2016 WL 6892079, at *2 (D.N.J. Nov. 21, 2016) ("When a court finds that a party cannot provide evidence of damages that are essential to its only legal claims such that only equitable claims remain, a federal district court can strike a jury demand without offending the Seventh Amendment." (citing AstenJohnson, 562 F.3d at 222-23).

Mall acknowledges that it is only entitled to a jury trial on claims seeking legal relief, not claims seeking equitable relief, but it argues that it seeks legal relief insofar as it seeks

compensatory damages, punitive damages, and attorneys' fees.[18]  We have already concluded, however, that Mall has failed to submit any admissible evidence of compensatory damages, and punitive damages are not available in the absence of compensatory damages.  We also reject Mall's argument that a claim for attorneys' fees alone can support a jury demand.  The NJFPA permits a franchisee to bring a claim for damages or injunctive relief and further states that the "franchisee, if successful, shall also be entitled to costs of the action, including, but not limited to, reasonable attorney's fees."  N.J. Stat. Ann. § 56:10-10; see also N.J. Stat. Ann. § 56:10-29.  Accordingly, if Mall prevails on its claim for injunctive relief in Count V, it is automatically entitled to attorneys' fees under the statute, and we will award those fees.  Under these circumstances, there is no factual question to be resolved about Mall's right to attorneys' fees, and the attorneys' fee claim does not give rise to a jury trial right.  See Vizant Techs., LLC v. Whitchurch, Civ. A. No. 99-3344, 2016 WL 7042218, at *1 (E.D. Pa. Mar. 1, 2016) (stating that when "there is no question of fact pertaining to the plaintiffs' entitlement to attorneys' fees and costs[,]" the court, not a jury, decides the amount of fees (citation omitted)); see also Dunkin' Donuts Inc. v. Guang Chyi Liu, Civ. A. Nos. 99-3344 and 00-3666, 2002 WL 31375509, at *2 n.3 (E.D. Pa. Oct. 17, 2002) ("Defendants may have had a right to a jury decision on whether Plaintiffs were entitled to recover attorneys' fees pursuant to the terms of the Franchise Agreement [but] they do not have the right to a jury decision as to the reasonable amount of attorneys' fees." (citation omitted)).

---

[18] Mall also suggests that, in spite of the applicable federal law, it has a right to a jury trial because the NJFPA prohibits a franchise agreement from "require[ing] the motor vehicle franchisee to waive trial by jury in actions involving the motor vehicle franchisor."  N.J. Stat. Ann. § 56:10-7.3.  However, the Dealer Agreement in this case does not contain a provision requiring Mall to waive trial by jury.  In addition, GM is not now requesting that Mall waive any existing jury trial right; rather, its position is simply that no right to a jury trial exists.  We therefore do not find the NJFPA provision on which Mall relies to be pertinent to our analysis.

Under all of these circumstances, we conclude that Mall does not have a right to a jury trial on Count V, which seeks only equitable relief.  We therefore grant GM's Motion to Strike Mall's Jury Demand and will proceed with a non-jury trial on Count V.

## IV.   CONCLUSION

For the foregoing reasons, we grant GM's Motion for Summary Judgment in its favor on Count I, II, III, VI, and VII, and Mall's request for punitive damages, and we deny Mall's Motion for Summary Judgment as to Count I.  We also grant GM's Motion to Preclude Evidence of Damages and its Motion to Strike Mall's Jury Demand.  Accordingly, we enter judgment in GM's favor on Counts I, II, III, VI, and VII, and will proceed to a non-jury trial as to only Count V, the claim for unlawful chargebacks in violation of N.J. Stat. Ann. § 56:10-15(f).

An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.